**Catherine COLE et al.**

**v.**

**HOUSING AUTHORITY OF the CITY OF NEWPORT et al.**

**Civ. A. No. 4265.**

United States District Court,
D. Rhode Island.
April 16, 1970.

Barry A. Fisher, and Joseph F. Dugan, of Rhode Island Legal Services, Inc., Providence, R. I., for plaintiffs.

Joseph J. Nicholson, Newport Housing Authority, Newport, R. I., for defendants.

## OPINION

PETTINE, District Judge.

■■ This is a civil rights suit authorized by 42 U.S.C. § 1983 in which the plaintiffs seek, on behalf of them-

selves and the class they represent, declaratory and injunctive relief against a two-year durational residency requirement for admission to federally financed public housing. Newport Housing Authority Regulations § 11(A) (4) (e) (Appendix A). Jurisdiction is properly grounded upon 28 U.S.C. § 1343.[1]

The court finds that there is no genuine issue of material fact and that plaintiffs are entitled to declaratory and injunctive relief as a matter of law. See Fed.R.Civ.P. 56(c).

### The Facts

■■ Catherine Cole is an adult citizen of the United States and has resided continuously within the City of Newport since September of 1969 when she arrived from Jamestown, Rhode Island. Barbara Jean Goodson is an adult citizen of the United States and has resided continuously within the City of Newport since May, 1969 when she arrived from New York City, New York.[2]

Defendant Housing Authority of the City of Newport is a public corporation which is a corporative governmental agency organized under the Constitution and laws of the State of Rhode Island, having its executive offices at 1 Park Holm, Newport. Within the City of Newport, defendant owns and operates public housing projects financed by the United States Government and the City of Newport. Defendants Robert C. Bell, Thomas Perrotti, John J. Flynn, Charles T. Kaull, and Albert A. Fournier are members of the Board of Commissioners of the defendant Housing Authority, and are charged by the laws of the State of Rhode Island, Housing Authorities Law, Rhode Island General Laws 45–25 et seq., with the responsibility for the operation of the defendant Housing Authority, including the promulgation of rules and regulations. Defendant William J. Donovan is Secretary of the defendant Housing Authority.

Plaintiff Catherine Cole moved to the City of Newport from Jamestown, Rhode Island in September of 1969. She has lived in Newport continuously since that date and intends to remain there permanently. Plaintiff Cole was born in Maryland June 15, 1946, and moved to Jamestown, Rhode Island approximately three months later. She lived in Jamestown continuously until December, 1967 when she moved to New Bedford, Massachusetts to work in the Neighborhood Youth Corps Program. After three months she returned to live with her mother in Jamestown where she remained until June, 1967 when she moved in with a girlfriend in Newport and worked at the Naval Enlisted Men's Mess Hall. In April, 1968, she moved back to Jamestown in order to have her mother help care for her newborn child. She remained in Jamestown until September, 1969, when she rented her present apartment in Newport. Plaintiff Cole is unmarried and brought her two minor children, ages 6 months and 1½ years, with her to Newport. The three-member family lives in a two-room apartment converted from a store front for which

---

1. This is not a matter for a three-judge federal court in that the regulation is not one of state-wide application. Holmes v. New York City Housing Authority, 398 F.2d 262 at 264 and n. 2 (2nd Cir., 1968).

2. Plaintiffs bring this action on their behalf and on behalf of all other persons similarly situated pursuant to Rule 23 of the Federal Rules of Civil Procedure. The members of this class are so numerous as to make joinder impracticable. There are questions of law and fact common to the class, and the claims or defenses of the representative parties are typical of the claims or defenses of the class. The representative parties fairly and adequately protect the interests of the class. The defendants have acted in respect to plaintiffs in a way generally applicable to the class plaintiffs represent, thereby making appropriate final injunctive relief and corresponding declaratory relief with respect to the class as a whole. The class may be described as all those persons who applied for public housing in Newport and who, because of the residency requirement, were not placed on the waiting list as of the date of their applications and have not yet been so placed or admitted.

plaintiff pays $110 a month rent. Plaintiff's income consists solely of $197.50 a month from Aid to Families with Dependent Children. Thus, over 55% of her total income goes for rent; were she in public housing rent would equal approximately 25% of income, or about $45.00.[3] After payment, plaintiff Cole is left with only approximately $87.50 a month to feed and clothe herself and her two infant children. This amount does not meet the $97.50 that is the very minimum budgeted needs suggested by the Rhode Island Department of Social Welfare.[4] Excessive rent, substandard, and socially undesirable living conditions led plaintiff to attempt to apply for public housing in November of 1968. She was told that her mailed application had not been received and that no housing was then available. In October, 1969, plaintiff with the assistance of New Visions for Newport personnel mailed a second application to defendant Housing Authority. Again the fact of receipt was denied. On November 7, 1969 plaintiff again submitted an application which was rejected on grounds of failure to satisfy the two-years residency requirement. On or about November 14, 1969, an appeal before the Board of Tenant Affairs was applied for. The Board met on November 25, 1969, and voted unanimously to uphold the Newport Housing Authority's decision. See Appendix B.

Plaintiff Barbara Jean Goodson and her two children, ages two and three, moved to the City of Newport from New York City, New York in May, 1969. She has lived in Newport continuously since that date and intends to remain there permanently. Her income consists solely of $198 per month that she receives from Public Assistance and she currently sublets an apartment from a friend for $60 per month. Plaintiff Goodson was born in New York City December 23, 1939. She lived there until 1954 when she was divorced and moved to Washington, D.C. where her grandmother resided. She returned to New York in 1968 and in May, 1969, moved to Newport, where her mother lives in Public Housing. The move to Newport was made so that mother and daughter could aid each other and together help raise the plaintiff's two children. Overcrowded, substandard, and socially undesirable living conditions led plaintiff Goodson to apply for Newport Public Housing in June 1969. The application was rejected on grounds of failing to satisfy the two year residency requirement. She applied again on or about December 29, 1969, but again was told that she would not be admitted until the residency requirement was met.

Plaintiffs are eligible for public housing on all other grounds of eligibility except that they have not resided within the City of Newport for at least two years.

As a result of the refusal by defendants to consider further plaintiffs' applications for public housing, plaintiffs and each of them are denied present places on the waiting list for accommodations.

### Legal Discussion

The requirement established by § 11 (A) (4) (e) of the regulations of the Newport Housing Authority that applicants for public housing be resident in Newport for two years, at least, immediately prior to application is attacked as being violative of the statutory scheme and as being violative of the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution.

42 U.S.C. § 1401 establishes the policy objectives of the federal low-rent housing laws. Additionally, § 1401 states the general policy to permit maximum authority to local agencies in the administration of low-rent housing. Certainly, § 1401 seeks to preserve broad powers of control, consistent with the statute, in local authorities in order to

---

3. See Newport Housing Authority Regulation.

4. See R. I. Manual of Public Assistance, Sec. 202, p. 2, 2b.

carry out cooperative federalism, one of the underlying philosophies of the statute. However, the eligibility requirements referred to in § 1401 most probably include those specifically defined in § 1402(1). Nowhere in the act is it indicated that residency requirements of a durational sort are permissible means of "effecting economies." Nowhere in the considerable legislative history of the federal housing laws are durational residency requirements even mentioned. S. 1685, 75th Congress, 1st Sess. (1937); S. 2654, 86th Congress, 1st Sess. (1959); S. 57, 86th Congress, 1st Sess. (1959) and S. 4035, 85th Congress, 2nd Sess. (1958); S. 2654, see Senate Report # 924, Senate Committee on Banking and Currency, 86th Cong., 1st Sess. (1959), U.S.Code & Admin.News, p. 2844; S. 57, See Senate Report, # 41, Senate Committee on Banking and Currency, 86th Cong., 1st Sess. and House Report Currency; 86th Cong., 1st Sess. (1959); S. 4035, See Senate Report # 1732, Senate Committee on Banking and Currency, 86th Cong., 2d Sess. (1958) and House Report # 2539 House Committee on Banking and Currency; 86th Cong., 2d Sess. (1958); S. 1685 Reports on S. 1685: Senate Report # 933, 75th Cong., 1st Sess. House Report § 1545, 75th Congress, 1st Sess. (1937). Given this silence and the indisputable fact that residency requirements frustrate the purposes of the Act by denying otherwise qualified low-income persons access to public housing and by lessening applicant pressure and thereby lessening pressure to clear slums and build still further public housing, the court is persuaded that the regulation must be declared violative of the statute. As the brief of plaintiffs makes clear:

> " * * * the establishment of a durational residency test for admission to public housing does not in any way further the objectives of the federal-state program, that objective being to provide shelter to families who are in need. The residency requirement simply denies certain families, who may be in critical need, the opportunity to apply on a ground which has no possible relationship to the urgency of need for public housing, contrary to the stated purposes of the legislation.

> In fact, the present regulation of the Housing Authority in this particular tends to undercut one of the major purposes of federal housing legislation. The extended waiting period assures that indigents moving into the Newport metropolitan area will have to submit to inadequate or over-priced housing conditions upon their arrival in the city and for some time thereafter. The residency requirement thus creates a ready market for the inferior products of slumlords.

> Since one of the major purposes of Congressional action in the field of housing has always been slum clearance and urban renewal, * * * by guaranteeing that at least some families must live in the slums for many months after arrival in Newport, the NHA is in effect supporting the continued existence of substandard housing in the city."

Cf. Thomas v. Housing Authority of the City of Little Rock, 282 F.Supp. 575 (E.D.Ark.1967).

There is still further reason to question the validity of this two-year residency requirement: it establishes two classes of citizens regarding access to one of life's fundamental needs—shelter. That classification which distinguishes those who have resided in Newport for two years from those who are more recently arrived is based solely on duration of residency and constitutes a very real inhibition upon the constitutionally protected right to travel. Accordingly, it must be justified by a compelling state interest. Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

The defendants argue that the two-year residency requirement imposed by the regulation is not a penalty upon the exercise of the plaintiffs' right to travel from state to state since it ignores

the fact that the overwhelming majority of the citizens of Newport satisfy the admitted fundamental human need of shelter by resorting to private housing; if private housing is reasonably available to plaintiffs in Newport, the Newport Housing Authority is not impeding their right to travel. It is urged that considering the amounts paid to parties in the plaintiffs' position for shelter and the prevailing rental rates in Newport, the plaintiffs' rental allotment would equal 100% of the actual monthly rental. It must follow, it is argued, that the defendants' regulation could not have deterred them from travelling into Rhode Island as their shelter whether they live in public or private housing is completely paid for.

This argument is sheer sophistry and is rejected for several reasons.

First, the private market is inadequate as a matter of law.

The federal and state legislative findings underlying the various public housing laws as well as subsequent governmental action employing those laws in Newport are conclusive upon the issue of the need for safe, and sanitary housing in the United States, and the State of Rhode Island and the City of Newport. There can be little question of a shortage of low income housing in the United States today. That the private market provides no adequate remedy and that subsidized housing is the only viable cure to housing the nation's poor is an express conclusion in the Rhode Island housing statute set out below. The need for public housing was recognized in 1937 with the passage of the first housing act and has been reaffirmed with early subsequent congressional approval of federal funds.

The federal statute states:

It is the declared policy of the United States * * * to assist the several States and their political subdivisions * * * to remedy the unsafe and unsanitary housing conditions and the acute shortage of decent, safe, and sanitary dwellings for families of low income, in urban * * * areas * * *.

This policy was strengthened and broadened by the Housing Act of 1949 which spoke of National Housing Policy:

The Congress declares that the general welfare and security of the Nation and the health and living standards of its people require housing production and related community development sufficient to remedy the serious housing shortage, the elimination of substandard and other inadequate housing through the clearance of slums and blighted areas, and the realization as soon as feasible of the goal of a decent home and a suitable living environment for every American family, thus contributing to the development and redevelopment of communities and to the advancement of the growth, wealth, and security of the Nation. 42 U.S.C. § 1441 (1964).

The relevant Rhode Island statute states:

It is hereby declared that unsanitary or unsafe dwelling accommodations exist in various cities of the state, and that such unsafe or unsanitary conditions arise from overcrowding and concentration of population, the obsolete and poor condition of the buildings, improper planning, excessive land coverage, lack of proper light, air and space, unsanitary design and arrangement, lack of proper sanitary facilities, and the existence of conditions which endanger life * * * that in all such cities many persons of low income are forced to reside in unsanitary or unsafe dwelling accommodations; that in various cities there is a lack of safe or sanitary dwelling accommodations available to all the inhabitants thereof and that consequently many persons of low income are forced to occupy overcrowded and congested dwelling accommodations; * * * *that these conditions cannot be remedied by the ordinary operations of private enterprises;* that the clearance, replanning and reconstruc-

tion of the areas in which unsanitary or unsafe housing conditions exist and the providing of safe and sanitary dwelling accommodations for persons of low income are public uses and purposes for which public money may be spent and private property acquired. (emphasis added.)

The very existence of such federally aided low-cost public housing in Newport is testimony to the fact that the United States Housing Authority, the Newport Housing Authority, and the Newport City Council have found that Newport has the kind of need that the statutes were designed to remedy. In pursuance of the national and state policies echoed in these statutes, the NHA (Newport Housing Authority) has time and again represented to and convinced the national and state housing authorities that a situation exists in Newport that merits the type of relief provided for in these statutes.

The two most recently approved applications for federal funds are designated RI 5-6, 200 new units approved December 11, 1968, and RI 5-7, 50 lease back units approved May 25, 1969. Only a small portion of the building has been completed to date in these projects. The housing conditions represented in the RI 5-6 and 5-7 applications presumably continue to exist in that it would be incumbent upon the NHA to notify the federal government to terminate these pending projects as soon as they felt there was no longer any need for additional subsidized housing in Newport.

Regarding RI 5-6, the court notes resolutions of both the NHA and the Newport City Council.

In Newport City Council Resolution No. 473, Resolution Authorizing and Directing Submission of Application for Reservation of Low-rent Housing and for a Preliminary Loan Authorizing Cooperation Agreement, the City Council recited the following:

Whereas the Housing Authority of the City of Newport, Rhode Island has found and hereby determines that there is a need for low-rent housing to meet needs not being adequately met by private enterprise within its area of operation.

This need was again represented by the Newport City Council in Resolution No. 141-68 of September 25, 1968:

Whereas, it is the policy of the City of Newport, Rhode Island to eliminate substandard and other inadequate housing, to prevent the spread of slums and blight, and to realize as soon as feasible the goal of a decent home in a suitable living environment for all of its citizens.

The very recent representations by the NHA in their RI 5-7 application to the Federal Housing Authority show that the NHA continues to claim that there presently exists in Newport a shortage of safe and sanitary low-rent housing.

On May 8, 1969, the following resolution was introduced and passed unanimously in a regular meeting of the Commissioners of the Housing Authority of the City of Newport, Rhode Island:

Resolution No. 486

RESOLUTION AUTHORIZING AND DIRECTING SUBMISSION OF APPLICATION FOR A LOW-RENT HOUSING PROGRAM

Whereas the Housing Authority of the City of Newport, Rhode Island, has found and hereby determines that there is a need for low-rent housing to meet needs not being adequately met by private enterprise within its area of operation;

NOW THEREFORE, BE IT RESOLVED BY THE COMMISSIONERS OF THE HOUSING AUTHORITY OF THE CITY OF NEWPORT, RHODE ISLAND, AS FOLLOWS:

The Secretary shall cause to be prepared and the chairman shall sign and send to the Housing Assistance Administration, Department of Housing and Urban Development, an application for financial assistance for 50 dwelling units to be provided by

leasing privately owned housing under Section 23 of the United States Housing Act of 1937, as amended. (The Minutes of the May 8, 1969, meeting of the Commissioners of the Housing Authority of the City of Newport, Rhode Island).

The applications for RI 5–6 and 5–7 require substantiation of the need for low cost housing. As testimony to the continuing need for low cost housing in Newport, it should be noted that both applications used the same material even though the applications were separated by over one year. This material consists of the following report and letter. The report was that of the Newport County Chamber of Commerce, dated August, 1968, entitled "Housing Needs on Aquidneck Island." The recommendations follow:

In view of the demonstrated shortage of low income and middle income housing on Aquidneck Island it is recommended:

I. That civic organizations, churches and other interested groups pool their leadership and financial resources to form a non-profit corporation to encourage and direct the rehabilitation and/or construction of new low income housing in the area; that the Newport County Chamber of Commerce offer the administrative direction during the initial phases of organization of this non-profit corporation to insure a meaningful program; and that the Chamber participate financially to stimulate the provision of "seed money" for the corporation.

II. That the City of Newport and the Towns of Middletown and Portsmouth in cooperation with the Newport County Chamber of Commerce initiate an educational program to make area residents aware of various Federal and State programs designed to stimulate construction and rehabilitation of housing.

III. That the Newport Redevelopment Agency initiate a study to determine the feasibility of proceeding with an Urban Renewal project in the West Broadway area to make suitable low income housing available and to encourage the more efficient utilization of taxable land in the City.

IV. That the City of Newport be encouraged to accelerate a concentrated minimum housing enforcement program to include upgrading existing sub-standard units.

V. That the Town of Middletown, when considering the adoption of a new zoning ordinance, take into consideration the need for low income housing with special reference to multiple dwelling and apartment house development.

VI. That Middletown and Portsmouth be encouraged to accelerate the extension of utilities (water and sewage) within the respective towns in order to stimulate housing starts.

VII. That the Newport Housing Authority expand its facilities to take care of additional Navy families.

VIII. That the Towns of Middletown and Portsmouth establish Housing Authorities to provide additional low income housing.

IX. That a copy of this report be given wide dissemination to include local, state and Federal agencies.

The letter, written March 27, 1968 by defendant Donovan, the Executive Secretary of the NHA, underscored the need for low cost housing in Newport for Herman D. Hillman, Assistant Regional Administrator for Housing Assistance. In that letter defendant stated:

You are aware of many of the problems relating to the overall housing picture in the City of Newport and the island on which it is located which includes the Towns of Middletown and Portsmouth, and a naval base of tremendous proportions. Over the past six months our newspapers have carried stories of varying quality but all of which point up to the need for ad-

ditional housing. Attached hereto you will find copies of the following stories:

Providence Sunday Journal—August 6, 1967

Providence Sunday Journal—December 3, 1967

Providence Journal—December 7, 1967

Providence Journal—December 8, 1967

Providence Sunday Journal—December 10, 1967

The Navy need for housing has been a continuing one over the last 20 years. On July 30, 1948, J. E. Maher, Rear Admiral, USN, Chief of Base Maintenance, wrote to Senator Green indicating a shortage in the Newport area of 8500 dwelling units. On February 20, 1957, Ralph Earle, Jr., Rear Admiral, USN, Base Commander at Newport, wrote to the President of the Real Estate Board. He indicated a need of 7100 dwelling units. In March of 1965, Arthur H. Taylor, Rear Admiral, USN, Base Commander indicated a need of 1147 units for shore based personnel. On July 10, 1967, Moans Johnston, Jr., Rear Admiral, USN, Base Commander prepared a memorandum indicating a net housing deficit of 2389 units. A copy of this memorandum is attached. In face of this soundly established need the Navy has under contract provision for the construction of 200 family dwelling units, and Federal Housing Administration has approved a 200 unit development under Section 221(d) (3) of the Housing Act. If we were to consider only 90% of the total requirements of this one segment of our population, this would indicate a shortage of 1388 units after these two developments are completed. We should also consider the fact that when our 170 unit development, RI 5–5, is completed in May of 1969 we expect approximately 125 family dwelling units to become available in the city.

The NHA's contradictory allegation that there is an adequate supply of low-income housing in Newport belies the very need for public housing.

Furthermore, the right to travel is violated even if some alternative housing exists. As stated in *Shapiro* the discrimination, "denied welfare aid upon which may depend the ability of the families to obtain the very means to subsist—food, shelter, and other necessities of life." Shapiro v. Thompson, 394 U.S. at 627, 89 S.Ct. at 1327. Again we see a clear recognition of the Court's rejection of any alternative source of welfare in the dissent by Chief Justice Warren in *Shapiro*.

"The burden (on interstate travel) is uncertain because indigents who are disqualified from categorical assistance by residence requirements are not left wholly without assistance. All the appellees in these cases found alternative sources of assistance after their disqualification."

The majority in *Shapiro* clearly rejected this approach. For these reasons, the defendants' approach to the constitutionality of the residency requirement is rejected.

Adequate shelter must be considered to be one of the essential fundamentals of human life. This fact has been repeatedly recognized by the United States Congress. See 42 U.S.C. §§ 1401, 1441, 1441(a). It has been recently acknowledged by the Supreme Court of the United States. See Shapiro v. Thompson, 394 U.S. 618, 627, 89 S.Ct. 1322, 22 L.Ed. 2d 600 (1969); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491, and nn. 14–17 (Concurring opinion Marshall, J.) (1970). See generally Michelman, Foreward: On Protecting the Poor Through the Fourteenth Amendment, 83 Harv.L.Rev. 7, 40 ff. and n. 94 (1969). And it is a fact which behavioral scientists clearly and rightfully recognize.

"The greatest material need of the poor is decent shelter. Positive motivation withers in the midst of rats, refuse strewn alleys, peeling plaster, broken windows, cold radiators, and leaky ceilings. Nearly 1000 adults and children live in one slum block of the District of Columbia. The poor inhabit the slums; and the slums dominate their lives." (Footnotes omitted) Wald, Law and Poverty at p. 12 (1965)

" * * * (A)ny common sense evaluation will tell us that the causation, in part, goes *from* poor housing *to* bad moral, mental, and physical health."

Gunnar Myrdal, An American Dilemma at p. 1290 (1st Ed. 1944). See generally A. Schoor, Slums and Social Insecurity, (U.S. Dept. of HEW, Soc. Sec. Admin., Div. of Research & Statistics, Research Report No. 1, Govt. Printing Office, 1966).

Moreover, not only is the instant residency requirement a limitation on access to a necessity of life, it also tends directly to inhibit freedom of movement and indirectly to diminish familial and consensual associations of persons. It has long been recognized that the basic human right to geographic mobility, either in pursuit of preferred associations and opportunities or merely seeking a change in environment, is constitutionally protected. It is unnecessary here to delve historically into the Constitutional background of this right, for the United States Supreme Court reaffirmed its existence very recently in deciding that durational residency requirements as prerequisites for public welfare are unconstitutional.

This Court long ago recognized that the nature of our Federal Union and our constitutional concepts of personal liberty unite to require that all citizens be free to travel throughout the length and breadth of our land uninhibited by statutes, rules, or regulations which unreasonably burden or restrict this movement. That proposition was early stated by Chief Justice Taney in the Passenger Cases, 7 How. 283, 492, 12 L.Ed. 702 (1849):

"For all the great purposes for which the Federal government was formed, we are one people, with one common country. We are all citizens of the United States; and, as members of the same community, must have the right to pass and repass through every part of it without interruption, as freely as in our own States."

We have no occasion to ascribe the source of this right to travel interstate to a particular constitutional provision. It suffices that, as Mr. Justice Stewart said for the Court in United States v. Guest, 383 U.S. 745, 757–758, 86 S.Ct. 1170, 1178, 16 L.Ed. 2d 239 (1966):

"The constitutional right to travel from one State to another * * * occupies a position fundamental to the concept of our Federal Union. It is a right that has been firmly established and repeatedly recognized.

" * * * [The] right finds no explicit mention in the Constitution. The reason, it has been suggested, is that a right so elementary was conceived from the beginning to be a necessary concomitant of the stronger Union the Constitution created. In any event, freedom to travel throughout the United States has long been recognized as a basic right under the Constitution."

Shapiro v. Thompson, 394 U.S. 618 at 629–631, 89 S.Ct. at 1329 (1969).

■ Because the effect of the classification is to infringe on a constitutional right, as well as upon a fundamental human need, the state must show a "compelling state interest" in maintaining the regulation. It therefore remains for this court to consider the possible compelling interests asserted by Newport's Housing Authority in justification of its discrimination.

■ *To discourage indigents from entering the City of Newport.* This objective rests on an incorrect assumption: that poor people are primarily motivated in making a geographical change by the availability or non-availability of public housing. But the facts surrounding the immigration of the named plaintiffs in this case demonstrate the mistake in this assumption. Even if a move to Newport is motivated by a desire to obtain public housing, a political subdivision is not constitutionally permitted to "punish" the indigent newcomer by denying him public housing facilities.

The United States Supreme Court dealt with both questions in its *Thompson* decision. After lengthy discussion of the discrimination against newcomer indigents which the Court had previously declared unconstitutional, the Court stated: "Thus, the purpose of deterring the in-migration of indigents * * * is constitutionally impermissible."

The Court then went further and stated: ·

"More fundamentally, a State may no more try to fence out those indigents who seek higher welfare benefits than it may try to fence out indigents generally. Implicit in any such distinction is the notion that indigents who enter a State with the hope of securing higher welfare benefits are somehow less deserving than indigents who do not take this consideration into account. But we do not perceive why a mother who is seeking to make a new life for herself and her children should be regarded as less deserving because she considers, among others factors, the level of a State's public assistance. Surely such a mother is no less deserving than a mother who moves into a particular State in order to take advantage of its better education facilities."

■ The situation with reference to public housing is wholly analogous; it must be concluded that a person moving into a jurisdiction in order to avail himself of public housing may likewise not be "fenced out" by an arbitrary length of residence requirement.

■ *To give priority in public housing facilities to those who are established residents of Newport.* As an alternative justification for the residency regulation in question, this objective too is impermissible. Because the number of public housing units available in Newport falls far short of known needs, the establishment' of some system of priorities is a necessity. Certain priorities are dictated by the federal legislation, such as those accorded to veterans' families, 42 U.S.C. § 1410(g) (2), or families displaced by urban renewal, 42 U.S.C. § 1415(7) (b). Except for those with statutory priorities, most families are placed on the waiting list in order of application.

But the durational residency requirement creates an additional priority unauthorized by the legislation: It gives long-time residents of Newport priority over newcomers. The purpose of this "priority" seems to be to reward those who have an investment in the community or have contributed to it in taxes or otherwise. But as the Supreme Court in *Thompson* points out, this reasoning:

"would logically permit the State to bar new residents from schools, parks, and libraries, or deprive them of police and fire protection. * * * The Equal Protection Clause prohibits such an apportionment of state services."

Thus, this possible objective of the regulation must also fall before the Equal Protection Clause.

■ *To provide an objective test of residence.* As noted earlier, where a classification infringes on the exercise of protected liberties, a mere showing of a rational relationship to some permissible state objective is not enough; the state must show a *compelling* interest. Although a two year require-

ment may serve some administrative convenience in determining residency, this is not enough. Investigation of public housing applicants is thorough and complete—as it is of welfare applicants—and facts establishing the reality of residency are easily ascertainable during this investigation. The usual test of "intent to remain" and "physical presence in the jurisdiction" would not be difficult to apply—and would avoid the overbroad sweep of the current requirement. The Supreme Court spoke to this justification also in *Thompson* and concluded:

> "The argument that the waiting period serves as an administratively efficient rule of thumb for determining residency similarly will not withstand scrutiny. The residence requirement and the one-year waiting-period requirement are distinct and independent prerequisites for assistance under these * * * statutes, and the facts relevant to the determination of each are directly examined by the welfare authorities. Before granting an application, the welfare authorities investigate the applicant's employment, housing, and family situation and in the course of the inquiry necessarily learn the facts upon which to determine whether the applicant is a resident."

In conclusion, the Supreme Court's decision in Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), declaring welfare residency laws unconstitutional is controlling and must operate to render unconstitutional the requirement here in question.

As in the *Thompson* case, the benefit involved concerns an essential of life, the basic human need for adequate shelter. As in *Thompson* the durational residency requirement operates to inhibit the exercise of certain elementary constitutional liberties, i. e. the freedom to travel and freedom of association. And finally, as in *Thompson*, the classification bears no rational relationship either to the purposes of the federal-state statutory program or to any other

permissible state objective—compelling or otherwise. In fact, as in *Thompson,* the regulation here in question serves only one purpose, that of discouraging immigration by the poor to the area. And that purpose has repeatedly been held to be an improper state goal.

One aspect of the instant case is different from *Thompson.* Two of the three justices dissenting in that case did so on the grounds that § 402(b) of the Social Security Act sanctioned the imposition of state durational residency requirements on welfare applicants. See Shapiro v. Thompson, 394 U.S. 618 at 644–645, 89 S.Ct. 1322 (Dissenting opinion of Warren, C. J., joined by Black, J.). But the difficulty created by that provision, concerning Congressional regulation of interstate commerce, is not present in the instant case. There is not a shred of evidence in the federal legislation that Congress had any expectation as to local length-of-residence admission requirements in the area of public housing.

In light of the foregoing, the Newport Housing Authority requirement of residence in the City of Newport for two years immediately prior to application for public housing is a violation of the Equal Protection Clause of the Fourteenth Amendment to the Constitution of the United States and on that ground must be declared by this court to be unconstitutional and therefore void. Declaratory relief to that effect will issue. The defendants are hereby permanently enjoined from enforcing § 11(A) (4) (e) of the Newport Housing Authority regulations against the plaintiffs or any member of their class. Furthermore, the applications for housing of the plaintiffs Cole and Goodson and of all other similarly situated applicants must be considered without regard to the residency requirements. Both plaintiffs and those similarly situated are to be placed on the waiting lists in the positions they would have occupied had they not been denied such placement by virtue of the residency requirement. Plaintiffs will prepare an order accordingly.

## APPENDIX A

### THE HOUSING AUTHORITY
of the
### CITY OF NEWPORT, RHODE ISLAND

STATEMENT OF POLICIES GOVERNING ADMISSION
TO AND CONTINUED OCCUPANCY OF THE HAA-
AIDED LOW-RENT HOUSING PROJECTS

SECTION I.  BASIC POLICY

In the operation of the low-rent housing program in the City of Newport, Rhode Island, it shall be the policy of the Authority to establish eligibility and rent requirements with due thought to accomplishing the objectives of providing decent, safe and sanitary housing for families of low-income, while effecting the promotion of economy and efficiency as required by the United States Housing Act and the Annual Contributions Contract.

In establishing occupancy policies, the Authority shall give full consideration to the requirements of the Annual Contributions Contract and to its public responsibilities for the rehousing of displaced families and persons, veterans and servicemen and their families and widows, the elderly and disabled, the handicapped, those living in substandard housing, those most urgently in need of rehousing and families receiving public assistance.

No family shall be denied the opportunity to lease or rent any dwelling suitable to its needs on account of race, color, creed or national origin.

No family may be declared ineligible solely on the basis of the written application.

The exercise of moral judgment is precluded.  No family shall be declared ineligible solely because of an illegitimate child or children.  However, the Authority must not and will not permit the facilities to be operated as brothels or places of assignation, to tolerate criminal activities within the facilities, or disorderly conduct, or conduct amounting to a nuisance or which seriously violates ordinary standards of decency.

Applicants who are found ineligible may request reconsideration and may submit additional information.

Eligibility will be determined in accordance with the overall objectives of The Housing Authority and of national policy to provide a decent living environment for all families in the City of Newport.

Determination of eligibility will be reached promptly—in no case more than three months.

SECTION II.  CONDITIONS GOVERNING ELIGIBILITY

A. Eligibility for Admission.  There are to be eligible for admission to HAA-aided low-rent housing projects operated by this Authority only those applicants:

1. who qualify as a family as defined in Exhibit III.

2. whose net family income at time of admission less

      a.   the amounts paid by the U. S. Government for disability or death as set forth in Exhibit II C.

3. whose net family assets do not exceed amount set forth in Exhibit II D.

4. who, except for the family of a veteran or serviceman or the family of any deceased Veteran or Serviceman are at the time of admission:

    a.   living in dwellings determined to be unsafe, unsanitary or overcrowded.

    b.   to be displaced by a low-rent housing project or by any public slum clearance, redevelopment or urban renewal project, or through action of a public body or court either through the enforcement of housing standards or through the demolition, closing, or the improvement of a dwelling unit or units.

    c.   actually without housing due to causes other than the fault of the tenant:

       (1) being without housing for willful or deliberate failure to pay rent or to carry out other normal obligations of tenancy cannot be interpreted as due to causes other than the fault of the tenant and therefore does not qualify an applicant under this provision. However, if a substantial reduction in a family's income, or an increase in rent beyond its reasonable ability to pay, have resulted in loss of accommodations, the Local Authority may consider these as causes other than the fault of the tenant.

    d.   about to be without housing as a result of a court order of eviction to causes other than the fault of the tenant:

       (1) the mere prospect of eviction is not sufficient to qualify a family under this provision. A court order of eviction must actually have been received by the family and it must have been issued for causes not construed to be the fault of the tenant.

    e.   who have been established residents of the City of Newport for two years, and

5. who conform to the occupancy limits set forth in Section VI.

B. Eligibility for Continued Occupancy. There are to be eligible for continued occupancy in the federally-aided low-rent projects operated by this Authority only those occupants:

1. who qualify as a family as defined in Exhibit III.

2. whose net income at time of reexamination less

    a.   allowable deductions defined in Exhibit II C.

3. whose net family assets do not exceed amount set forth in Exhibit II D.

4. who conform to the occupancy limits for continued occupancy established in Section VI.

SECTION III.  INCOME LIMITS

Maximum income limits for admission and continued occupancy are set forth in Exhibit II.  No minimum income limits are established.

SECTION IV.  SELECTION OF TENANTS

A.  Order of Preference.  As among eligible applicants of appropriate size and composition for the available dwelling units, the following order of preference is to be applied in selecting tenants for each range of specified rent to be established, and is on a nondiscriminatory basis with respect to race, color or national origin.

1.  First preference is to be given to families which are to be displaced by any low-rent housing project or by any public slum clearance, redevelopment, or urban renewal project, or through action of a public body or court, either through the enforcement of housing standards or through the demolition, closing, or improvement of dwelling units, or which were so displaced within three years prior to making application to such public housing agency for admission to any low-rent housing: Provided, that as among such projects or actions, the public housing agency may from time to time extend a prior preference or preferences.

2.  Second preference is to be given to families of veterans and servicemen not qualifying as displaced families as in 1. above.  As among such families, first preference is to be given to families of disabled veterans whose disability has been determined by the Veterans Administration to be service-connected, and second preference is to be given to families of deceased veterans and servicemen whose death has been determined by the Veterans Administration to be service-connected.

APPENDIX B

8 Hillside Avenue
Newport, Rhode Island
November 26, 1969

Miss Katherine Cole
70½ Spring Street
Newport, Rhode Island

Dear Miss Cole:

The Board of Tenant Affairs met on November 25, 1969, and voted unanimously to uphold the decision of the Newport Housing Authority and denied your application for public housing.

The Board's decision is based upon your failure to qualify as a resident of the City of Newport for two years prior to your application for housing.

Very truly yours,

BOARD OF TENANT AFFAIRS

(s) Lester S. Mines

Lester S. Mines
Chairman