Fannie JEFFERIES, individually and on behalf of all other persons similarly situated, Plaintiff,

v.

Jule SUGARMAN, as Commissioner of the Department of Social Services of the City of New York, and George K. Wyman, as Commissioner of the Department of Social Services of the State of New York, Defendants.

No. 71 Civ. 2060.

United States District Court, S. D. New York.

Argued July 6, 1971.

Decided June 30, 1972.

Toby Golick, New York City (Reginald S. Matthews, Jamaica, N. Y., Jonathan Weiss, New York City, Center on Social

Welfare Policy and Law, of counsel), for plaintiff Jefferies.

John T. Hand, White Plains, N. Y. (Mark Chertok, Martin A. Schwartz, Jerald Slate, White Plains, N. Y., Legal Aid Society of Westchester County, of counsel), for intervenor-plaintiffs Maxine Handel, Pearl Woods, and Alice Woods.

Ronald D'Angelo, Brooklyn, N. Y. (William L. Reese, Jr., Bedford-Stuyvesant Community Legal Services Corp., of counsel), for applicant for intervention Patricia Carson.

Elliot P. Hoffman, New York City (J. Lee Rankin, Corp. Counsel, New York City, of counsel), for defendant Sugarman.

Stephen P. Seligman, Asst. Atty. Gen., of the State of New York (Louis J. Lefkowitz, Atty. Gen., Samuel A. Hir-showitz, First Asst. Atty. Gen., of counsel), for defendant Wyman.

F. Sherwood Alexander, White Plains, N. Y., of counsel to John J. S. Mead, County Atty., for defendant Louis P. Kurtis, Commissioner of the Department of Social Services of Westchester County.

Before HAYS, Circuit Judge, and TYLER and TENNEY, District Judges.

HAYS, Circuit Judge:

■ In this class action Mrs. Jefferies [1] challenges the validity of New York Social Services Law § 131(4) (McKinney's Consol.Laws, c. 55, Supp.1971 [2] and regulations adopted pursuant thereto, 18 N.Y.C.R.R. §§ 385.1, 385.7.[3] Mrs. Jef-

---

[1]. Mrs. Jefferies' name is erroneously spelled "Jeffries" in the complaint.

[2]. "4. No assistance or care shall be given to an employable person who has not registered with the nearest local employment agency of the department of labor or has refused to accept employment in which he is able to engage.

A person shall be deemed to have refused to accept such employment if he:

a. fails to obtain and file with the social services district at least semi-monthly a new certificate from the appropriate local employment office of the state department of labor stating that such employment office has no order for an opening in part-time, full-time, temporary or permanent employment in which the applicant is able to engage, or

b. willfully fails to report for an interview at an employment office with respect to employment when requested to do so by such office, or

c. willfully fails to report to such office the result of a referral to employment, or

d. willfully fails to report for employment. Such willful failures or refusals as above listed shall be reported immediately to the social services district by such employment office.

For the purposes of this subdivision and subdivision five, a person shall be deemed employable if such person is not rendered unable to work by: illness or significant and substantial incapacitation, either mental or physical, to the extent and of such duration that such illness or incapacitation prevents such person from performing services; advanced age; full-time attendance at school in the case of [a] minor, in accordance with provisions of this chapter; *full-time, satisfactory participation in an approved program of vocational training or rehabilitation*; the need of such person to provide full-time care for other members of such person's household who are wholly incapacitated, or who are children, and for whom required care is not otherwise reasonably available, notwithstanding diligent efforts by such person and the appropriate social services department to obtain others to provide such care. A person assigned to and participating in a public works project under the provisions of section one hundred sixty-four or three hundred fifty-k of this chapter shall be deemed to be employable but not employed.

Every employable recipient of public assistance or person who is deemed not to be employable by reason of full-time satisfactory participation in an approved program of vocational training or rehabilitation shall receive his public assistance grants and allowances in person from the division of employment of the state department of labor, in accordance with regulations of the department." (Emphasis added.)

[3]. "Section 385.I Definition of an employable person. (a) Each ADC or HR applicant or recipient age 16 and over

feries claims that the application of these provisions allows mothers who are enrolled in "vocational" training programs to receive welfare benefits if they are otherwise eligible, and denies such benefits to mothers who, except that they are enrolled in an "academic" course of instruction, are similarly situated and that these provisions thus applied violate her rights to due process and equal protection of the law, infringe her first amendment rights by penalizing her for going to college, and conflict with the federal Aid to Families with Dependent Children program, 42 U.S.C. § 601 et seq. (1970). Maxine Handel, Pearl Woods, and Alice Woods (hereinafter referred to as the Westchester plaintiffs), were permitted to intervene over the defendants' objections.[4]

shall be determined employable except by reason of:

(1) full-time employment;

(2) attendance at school, including a vocational or technical school, a college or a university, for a minor other than an emancipated minor;

(3) attendance full-time in grade or high school for an emancipated minor;

(4) *full-time, satisfactory participation in an approved program of vocational training or rehabilitation which shall include but not be limited to participation in the work incentive program or a two-year college program with a specific vocational objective;*

(5) part-time employment to the extent permitted by medical verification, or to the extent permitted by inability to secure adequate care for children or other incapacitated members except on a part-time basis;

(6) mental or physical illness or incapacity medically verified to be of such significant or substantial nature as to prevent such person from engaging in employment; age shall be a basis of unemployability only when it is verified that the individual is potentially hazardous to himself or others with whom he is associated; and persons with a history of drug addiction shall be deemed employable only when determined medically to be free of drug use or to be participating in a methadone maintenance program or a rehabilitation program; or

(7) the need of such person to provide full-time care for other members of such person's household who are verified to be wholly incapacitated, or who are children, and for whom required care is not otherwise reasonably available, notwithstanding diligent efforts by such person and the social services district to obtain services or the assistance of others to provide such care.

(b) A HR recipient participating in a public work project established under section 164 of the Social Services Law shall be deemed employable but not employed." (Emphasis added.)

"385.7 [formerly § 385.6] **Sanctions.** (a) A person who (1) voluntarily terminates employment or reduces his earning capacity for the purpose of qualifying for assistance or a larger amount thereof, or (2) without good cause fails or refuses to undergo a necessary medical examination or treatment, or to accept referral to and participate in a vocational rehabilitation or training program, including the work incentive program, or refuses to accept referral to and work in employment, including work relief, in which he is able to engage, shall be:

(i) disqualified from receiving assistance for 30 days thereafter and until such time as he is willing to comply with the requirements of this Part; except that

(ii) an applicant for or recipient of HR who voluntarily terminated employment or reduced his earning capacity shall be disqualified from receiving assistance for 75 days thereafter and until such time as he is willing to comply with the requirements of this Part.

(b) Any person who applies for HR or requests an increase in his grant, within 75 days after voluntarily terminating employment or reducing his earning capacity or similarly within 30 days for ADC, shall be deemed to have voluntarily terminated employment or reduced his earning capacity for the purpose of qualifying for such assistance or larger amount thereof in the absence of evidence to the contrary supplied by such person."

4. A Mrs. Patricia Carson also moved to intervene, but the court did not rule on her motion at the time of argument. Mrs. Carson and her husband, the parents of an infant child, are both enrolled in four-year college programs and are studying *to become teachers. Neither has employment skills, and the family has been receiving AFDC benefits since July 1970.*

Mrs. Jefferies purports to represent the class of "parents of minor children who are otherwise eligible for public assistance [AFDC] but who are denied such assistance on the grounds that they are enrolled in 'academic' rather than 'vocational' education programs and [are] therefore deemed available for employment." She is the mother of one child, and the father is absent. Before September, 1969 she was employed as a typist at a salary of $125 per week, and was not receiving any public assistance. She left her job to enter Queens Community College with the aim of becoming a teacher, aided by a full-tuition scholarship under the federally sponsored "College Discovery Program." She received emergency assistance from the New York City Department of Social Services from September 11 to December 11, 1969, at which time benefits to both her and her child were terminated, pursuant to the provisions of state law challenged here, because she refused to accept employment. In a Decision After Fair Hearing, benefits for the child were reinstated, but the denial of benefits to Mrs. Jefferies was affirmed. The defendants urge that since she already has shown the ability to be self-supporting, she is not "otherwise eligible for welfare" and thus does not adequately represent the class she claims to represent. We disagree; since her child is "both needy and dependent," Doe v. Swank, 332 F.Supp. 61, 63 (N.D.Ill.) (three-judge court), aff'd mem. sub nom. Weaver v. Doe, 404 U.S. 987, 92 S.Ct. 537, 30 L.Ed. 2d 539 (1971); Doe v. Shapiro, 302 F. Supp. 761, 764 (D.Conn.1969) (three-judge court), appeal dismissed as untimely docketed, 396 U.S. 488, 90 S.Ct. 641, 24 L.Ed.2d 677 (1970), the house-

hold is within the purview of the AFDC program, and she has standing to raise the issue of whether she can be denied benefits for refusal to accept employment while attending college, while those attending vocational schools and who refuse employment continue to receive benefits.

The Westchester intervenors are in a different situation, and they perhaps present the issues in this case more clearly than does Mrs. Jefferies. They have from three to six minor children each and, since their husbands left the home, have continuously been receiving welfare benefits even when they have been employed. Thus, unlike Mrs. Jefferies, they have no history of being self-supporting in the regular economy. Each of them, with the approval of her caseworker, enrolled as a full-time student in a four-year college program, with a specific vocational objective. In June, 1971 each was advised that her welfare benefits would be terminated unless she enrolled in vocational training courses under the federal Work Incentive Program (WIN), 42 U.S.C. §§ 602(a)(19), 630 et seq. (1970).

By now it is well settled that legislative classifications in the welfare area are not subject to the rule requiring "strict scrutiny." "If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" Dandridge v. Williams, 397 U.S. 471, 485, 90 S.Ct. 1153, 1161, 25 L.Ed.2d 491 (1970), quoting Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 55 L.Ed. 369 (1911). See also Jeffer-

In 1971 Mrs. Carson, but not her husband, was informed by the New York City Department of Social Services that her public assistance would be discontinued unless she left college to seek employment. Mrs. Carson asserts that the only difference between her situation and that of her husband is that he is enrolled in the SEEK program (a special program of the City University of New York pro-

viding remedial assistance to students to enable them to earn college degrees) while she is not.

Mrs. Carson thus challenges state practices in addition to those challenged by the main plaintiffs, and we therefore deny her motion to intervene. To the extent that she *is* a member of plaintiffs' class, her rights are determined in accordance with this opinion.

son v. Hackney, U.S., 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972). Applying this standard to the case at hand, we cannot find that the "academic-vocational" distinction embodied in New York's welfare practices violates the equal protection clause. See Money v. Swank, 432 F.2d 1140 (7th Cir. 1970). Plaintiffs urge that the distinction is irrational in view of the purpose of the AFDC program to make families self-supporting, because college graduates are more employable than persons who have merely received vocational training. The statistics cited to us show that of approximately 25,000 welfare recipients receiving vocational training, only about 2,000 have become employed, and of those many continue to receive assistance, though this is principally because of the income exemption provisions of the Work Incentive Program, 42 U.S.C. § 602(a) (8) (A) (ii) (1970). However, this proves only that the WIN program in New York is not working very well, not that it would work any better if the state disregarded the distinction between academic and vocational training.

 Furthermore, it appears from the deposition of defendant Wyman, and from the regulations, 18 N.Y.C.R.R. § 385.1(4) (a recipient is not "employable" if enrolled in an approved "two-year college program with a specific vocational objective") that the distinction in New York is really between two-year and four-year programs. It is urged that even this classification operates irrationally, since some recipients will need pre-vocational training before they enter a two-year program, and thus will receive assistance for more than two years, while a recipient who has less than two years of a four-year program to complete is denied benefits. However, it is clear that the distinction is based upon the state's desire to use its limited welfare funds to secure at least some useful training to a larger number of people, and not to assist persons whose education has gone beyond a certain point. We cannot say that such a policy is irrational. It is true that there is dictum in Townsend v. Swank, 404 U.S. 282, 291–292, 92 S.Ct. 502, 30 L.Ed.2d 448 and n. 8 (1971) that might be thought to be contrary, but at least as applied to these facts it is entitled to little or no weight.

The plaintiffs' contention that New York is infringing on their first amendment rights is plainly frivolous and need not detain us further.

Having found the plaintiffs' constitutional claims to be without merit, we remand the case to Judge Tenney, who sought the three-judge court, for consideration of the pendent statutory claims. Rosado v. Wyman, 397 U.S. 397, 402–403, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). See also Wyman v. Rothstein, 398 U.S. 275, 90 S.Ct. 1582, 26 L.Ed.2d 218 (1970); Boddie v. Wyman, 434 F.2d 1207, 1208 (2d Cir. 1970), aff'd mem., 402 U.S. 991, 91 S.Ct. 2168, 29 L.Ed.2d 157 (1971).

TENNEY, J., dissents in part in separate opinion.

TENNEY, District Judge (concurring in part and dissenting in part):

Although I concur with the majority's disposition of plaintiffs' first amendment claims,[1] I must dissent from their

---

1. Plaintiffs attempt to come within the more stringent "compelling state interest" test set forth in Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed. 2d 600 (1969), by alleging that the academic-vocational classification challenged herein infringes upon their first amendment rights of free association. The only case even possibly supporting such an argument is Cole v. Housing Authority, 312 F.Supp. 692 (D.R.I.), aff'd, 435 F.2d 807 (1st Cir. 1970), wherein the court struck down a two-year residency requirement for admission to public housing as violative of the equal protection clause on the grounds that it limited access to a necessity of life (shelter) and tended directly to infringe upon the constitutional right to travel and indirectly to diminish familial and consen-

holding under the fourteenth amendment.

Under the Supreme Court's ruling in Dandridge v. Williams, 397 U.S. 471, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970), the test for determining whether a state welfare classification is violative of equal protection is the traditional "rational basis" test:

"In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect. If the classification has some 'reasonable basis,' it does not offend the Constitution simply because the classification 'is not made with mathematical nicety or because in practice it results in some inequality.'" (Citation omitted.) *Id.* at 485, 90 S.Ct. at 1161.

The *Dandridge* Court gave great weight to the fact that states have finite resources to devote to social welfare and that the federal Social Security Act gives them great latitude in dispensing them. As long as "a solid foundation for the regulation can be found" (*Id.* at 486, 90 S.Ct. at 1162.) in the state's legitimate purpose in enacting the regulation, no constitutional violation will ensue.

*Dandridge,* therefore, sets forth four factors to be considered in determining whether a state welfare classification is violative of equal protection: (1) the state's legitimate purpose in enacting the challenged regulation; (2) the means used to effect that purpose; (3) whether the means used are rationally related to the purpose sought to be achieved; and (4) whether the means used are such as to ensure the fiscal integrity of the state's welfare program—*i. e.,* whether the means used are economically sound.

In *Dandridge,* the purpose of the challenged regulation was to provide the greatest amount of aid to the largest number of needy people by the most economic method. The means used to effect that purpose was a maximum grant system whereby the state was able to provide grants to a larger *number* of family units by reducing the *amount* of the grants provided to very large family units. Clearly, the means were rationally related to the purpose of the regulation, and moreover, were such as to ensure the fiscal integrity of the state's welfare program.

Applying the foregoing analysis to the instant case, the purpose of the federal AFDC–WIN program and accompanying state regulations which embody the academic-vocational distinction is to "help . . . [AFDC recipients] to attain or retain capability for . . . *maximum* self-support and personal independence" (emphasis added) (42 U.S.C. § 601) and to restore "the families of . . . individuals [receiving AFDC] to independence and useful roles in their communities." 42 U.S.C. § 630. The means adopted by the state to effect that purpose is to provide public assistance benefits to those enrolled in two-year college programs or vocational training courses, but not to those enrolled in four-year college programs.

The instant case differs from *Dandridge,* however, in that the means used by the state to effect the legitimate statutory purpose are not rationally related to the ends sought to be achieved, and moreover, are not such as to ensure the fiscal integrity of the state's welfare program.

Townsend v. Swank, 404 U.S. 282, 92 S.Ct. 502, 30 L.Ed.2d 448 (1971) supports this view, for although that case was decided on statutory grounds, the Court strongly questioned the rationality of the academic-vocational distinction:

"The majority [of the court below] justified the classification as designed

---

sual associations of persons. The opinion fails to develop the freedom of association point, however. In the instant case, any infringement upon first amendment freedoms is so minor as not to rise to the level of a constitutional issue. *See* Lane v. McGarry, 320 F.Supp. 562, 564 (N.D.N.Y.1970).

to attain the twin goals of aiding needy children to become employable and self-sufficient, and of insuring fiscal integrity of the State's welfare program. We doubt the rationality of the classification as a means of furthering the goal of aiding needy children to become employable and self-sufficient; we are not told what basis in practical experience supports the proposition that children with a vocational training are more readily employable than children with a college education." *Id.* at 291, 92 S.Ct. at 508.[2]

The statistics cited to this Court with regard to the rationality of the academic-vocational distinction show that as of March 1971, 25,900 AFDC recipients had been referred to the WIN program since its inception in 1967. Of these 25,900, only 1,921 have successfully completed their training and are employed. Of these 1,921, a "predominant" number are still receiving welfare assistance. Depos. of Comm'r Wyman by Phillips, Ass't Comm'r, at 23–25. It is apparent, therefore, that the academic-vocational distinction is not rationally related to the legitimate statutory purpose of enabling AFDC recipients to become financially independent and off the welfare roles.

The majority insists that these statistics show only that the WIN program is not working very well, but to me they demonstrate not only the irrationality of the academic-vocational distinction, but also unsound fiscal policy.

This latter point is particularly evident when one examines the way in which the academic-vocational distinc-

tion operates. Theoretically, the state sets forth two conditions an AFDC recipient must meet in order to qualify for assistance while engaged in training under either the WIN program or the state work rule: (1) her program must be of a maximum duration of two years, and (2) it must lead to a specific vocational objective. Although specifying a two-year maximum, the state actually provides benefits to AFDC recipients engaged in training for more than two years if, for instance, the recipient needs pre-vocational training to complete her basic literacy or to obtain her high school equivalency certificate. But New York has clearly demonstrated that it does not provide public assistance benefits to enable a recipient to matriculate at a four-year college, even if she has less than two years to complete for her degree, *solely* because she would be engaged in academic rather than vocational training. Depos. of Comm'r Wyman by Phillips, Ass't Comm'r, at 37.

So while the state is willing to provide benefits for more than two years to a welfare recipient who, even after receiving vocational training, is not likely to get off the welfare rolls, it is unwilling to provide such assistance for four years or less to enable a recipient who has the requisite aptitude to obtain a degree that would ensure her becoming financially independent.[3] I find this irrational.

It is just this latter situation which is presented most sharply by the Westchester intervenors. Each of the three Westchester intervenors is estranged from her husband; each has from three to six minor dependent children; each

2. The Court further stated that "a classification which channels one class of people, poor people, into a particular class of low paying, low status jobs would plainly raise substantial questions under the Equal Protection Clause." Townsend v. Swank, *supra,* 404 U.S. at 292 n. 8, 92 S.Ct. at 908.

3. It is important to note that the instant case is distinguishable from Money v.

Swank, 432 F.2d 1140 (7th Cir. 1970), cited by the majority in support of its holding that the academic-vocational distinction does not violate the equal protection clause. There, as in Napper v. Wyman, 305 F.Supp. 429 (S.D.N.Y.1969) (which has a similar holding), the plaintiffs sued the state for tuition grants. Here, plaintiffs seek only living expenses; their tuition is completely financed by scholarships and loans.

has a long history of receiving public assistance, even while employed; and two of the three have one year of college credit acquired some years ago. All three were encouraged by their respective caseworkers to enroll in four-year college programs *precisely because* vocational training would never generate the income necessary to enable them to become financially independent.

The majority holds that the academic-vocational distinction "is based upon the state's desire to use its limited welfare funds to secure at least some useful training to a larger number of people." But I question the "usefulness" of vocational training for those AFDC recipients, like the plaintiffs herein, for whom such training will not make it possible for them to become financially independent, and who, moreover, possess the intellectual capacity to pursue a course of study which would ensure such a result.

I am not suggesting that the state be required to provide public assistance benefits to *all* AFDC recipients who desire to enroll in four-year college programs. Whether any particular AFDC recipient would be accorded benefits while pursuing academic training should depend, as it has in the past,[4] upon that recipient's intellectual capabilities and on whether the degree she seeks is tied to a specific vocational objective to ensure her becoming self-supporting and off the welfare rolls. An across-the-board denial of public assistance to those AFDC recipients enrolled in four-year academic programs, while providing such assistance to those enrolled in vocational training programs, is not rationally related to the state's legitimate interest in providing training for welfare recipients to enable them to become financially independent, and does little to ensure the fiscal integrity of its welfare program.

On the basis of the foregoing analysis, I would find for the plaintiffs.

4. It appears that until the end of 1969, the Department of Social Services did authorize attendance at four-year colleges for individual welfare recipients on a

discretionary basis. Depos. of Comm'r Wyman by Phillips, Ass't Comm'r, at 3–4.