Catherine COLE et al., Plaintiffs, Appellees,

v.

HOUSING AUTHORITY OF the CITY OF NEWPORT et al., Defendants, Appellants.

No. 7680.

United States Court of Appeals, First Circuit.

Dec. 7, 1970.

Victor A. Altman, Washington, D. C., with whom David L. Krooth, J. H. Krug, Washington, D. C., Joseph J. Nicholson, Newport, R. I., and Krooth & Altman, Washington, D. C., were on brief, for appellants.

Barry A. Fisher, Providence, R. I., for appellees.

Christopher Hayes, Clancy, Jonathan Weiss, and E. Judson Jennings, New York City, on brief for Columbia Center on Social Welfare Policy & Law, amicus curiae.

Anthony B. Ching, Cambridge, Mass., Robert E. Mittel, Portland, Me., and Henry M. Feinstein, Cambridge, Mass., on brief for The Harvard Civil Rights—Civil Liberties Research Committee, Pine Tree Legal Assistance, Inc., and Fair Housing Inc., amici curiae.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

COFFIN, Circuit Judge.

■ The question on this appeal is whether the district court properly granted summary judgment to two newly arrived citizens of Newport, Rhode Island, who sought to apply to the defendant Newport Housing Authority[1] for admission to its federally-aided, low-rent, public housing projects notwithstanding the Authority's requirement that only those who have been residents of Newport for two years shall be eligible. Cole v. Housing Authority of City of Newport, 312 F.Supp. 692 (D.R.I. 1970).

Plaintiffs assert that the two year durational requirement violates their rights under the Equal Protection clause of the Fourteenth Amendment, entitling them to a cause of action under 42 U.S.C. § 1983, with jurisdiction based on 28 U.S.C. § 1343. In particular, plaintiffs claim, on their own behalf and on behalf of all new residents similarly situated, that the Authority's durational requirement establishes a classification of Newport residents in terms of the length of residence, which impinges upon their constitutional right to travel without serving any legitimate or compelling interest of the Authority. Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), say plaintiffs, commands the result they achieved in the district court and seek to have upheld here.[2]

The facts necessary for considering the important legal issue are few. Each

1. Individual members of the Authority were also named defendants.

2. Relying on *Shapiro*, several district courts have struck down durational residency requirements for various state benefits. *See* Keenan v. North Carolina Board of Law Examiners, 317 F.Supp. 1350, (D.N.C.1970) (bar examination); Arnold v. Halifax Hospital District, 314 F.Supp. 277 (M.D.Fla.1970) (free medical care); Crapps v. Duval County Hospital Authority, 314 F.Supp. 181 (M.D. Fla.1970) (free medical care); Vaughan v. Bower, 313 F.Supp. 37 (D.Ariz.1970), aff'd, 400 U.S. 884, 91 S.Ct. 139, 27 L.Ed.2d 129 (1970) (commitment to state mental hospital); King v. New Rochelle Municipal Housing Authority, 314 F. Supp. 427 (S.D.N.Y.1970) (public housing). The Northern District of New York has rejected a challenge to residency requirements for public housing based on a claim that the requirements violated the United States Housing Act of 1937 and the right to travel, Lane v. McGarry, 320 F.Supp. 562 (N.D.N.Y., 1970).

plaintiff is a young mother with two children. One is divorced; one, unmarried. One moved from another state; the other moved from a community within the state. The total income of each is in the form of some kind of public welfare assistance. Each applied for admission to public housing shortly after arriving in Newport and was refused on the ground of failure to satisfy the two-year residency requirement.

While each plaintiff secured private housing, the rental being paid by a welfare allotment, there is no doubt on this record that plaintiffs were disadvantaged in being foreclosed from public housing occupancy. The Authority makes a belated effort to claim that an issue of fact exists as to whether the private housing market was adequate, but its answer admitted an allegation of the complaint that, in June 1969, one of the plaintiffs applied for admission to public housing because of "overcrowded, substandard, and socially undesirable living conditions". Moreover, in argument before the district court, counsel for the Authority conceded that "we could use more low rent housing" and that "there isn't even enough housing to take care of residents". The very fact that one of the plaintiffs, with her two children, was living in a two-room apartment converted from a store front, with a rental of $110 a month, costing $65 a month more than public housing, and the existence of a six-month waiting list of eligible persons awaiting a vacancy in public housing, seem indicative of a continuing insufficiency of decent facilities at a low cost.[3]

Plaintiffs having been disadvantaged by the Authority's classification, we are required to determine if the classification is a legitimately defensible difference.[4] In so determining we must first identify the burden of justification the Authority must meet to legitimize the difference. The traditional test requires the difference to be rationally related to a permissible goal.[5] But if a fundamental personal interest is involved, the difference is legitimately defensible only if it furthers a compelling state interest.[6] To determine which defense of its classification—rationally related to a permissible goal or rationally related to a compelling state interest—the Authority is required to put forth, we examine the individual interest involved, the right to travel, to determine if it is fundamental.

The Supreme Court has clearly indicated that the right to travel is a fundamental personal right that can be impinged[7] only if to do so is necessary to promote a compelling governmental interest. *Shapiro, supra* at 634, 89 S.Ct. 1322. *Shapiro* struck down a state, one-year residency requirement as a condition for obtaining welfare benefits. The requirement was held to impinge on the right to travel and was not justified by a compelling state interest. But the amount of impact calling for such a justification was not made clear. The Court spoke of the requisite impact in three ways. In discussing the purpose of the durational requirement, it noted the de-

---

3. Plaintiffs' class would also include low income wage earners with large families. Such persons would be disadvantaged to a considerable extent if they were forced to seek housing on the open market instead of availing themselves of an adequate number of rooms for a rental limited to 25% of income.

4. The phrase "legitimately defensible difference", applicable to both a traditional and a "rigid" scrutiny of justification, is borrowed from Ely, Legislative and Administrative Motivation in Constitutional Law, 79 Yale L.J. 1205, 1223–1224 (1970).

5. Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78–79, 31 S.Ct. 337, 55 L.Ed. 369 (1911).

6. Ely. *supra* at 1223–1224; Note, Developments in the Law—Equal Protection, 82 Harv.L.Rev. 1065, 1076–1077 (1969).

7. "Impinged" is the word used by Mr. Justice Stewart in his concurring opinion. 394 U.S. at 644, 89 S.Ct. 1322. We use it here as a neutral term. As will be made clear, the amount of interference with "travel" necessary before the right is impinged is subject to some doubt.

terrent effect on indigents desiring to migrate and resettle. 394 U.S. at 629, 89 S.Ct. 1322. Subsequently it focused on the post-moving penalizing effect. 394 U.S. at 634, 89 S.Ct. 1322. And finally, in capsuling its holding, it labelled the classification suspect because it "touches on the fundamental right of interstate movement". 394 U.S. at 638, 89 S.Ct. at 1333. That this quoted phrase is not to be taken literally is indicated by the Court's appended footnote 21, at 638, 89 S.Ct. 1322, which held open the possibility that some waiting period or residence requirements might serve a compelling interest or might not be penalties.

Analysis also reveals that the impingement on the right to travel does not have to rise to a fixed level of deterrence.[8] If a certain amount of travel must be deterred, courts would be faced with the empirical question whether deterrence was actually achieved. Yet in *Shapiro*, the Court cited no evidence of deterrence but rather assumed that it existed. Sim-

ilarly, the Court has recently affirmed a decision of a three-judge district court invalidating a state law permitting the superintendent of a state mental hospital to return to their state of former residence persons admitted to the hospital who had not resided in the state for at least one year. Vaughan v. Bower, 313 F.Supp. 37 (D.Ariz.1970), aff'd, 400 U.S. 884, 91 S.Ct. 139, 27 L.Ed.2d 129 (1970). There was no empirical demonstration that this state law deterred anyone from traveling, and logically it would seem doubtful that such a law could have significant deterrent effect. We suspect that few, if any, persons consider the possibility that they will be committed to a mental hospital when they decide to travel interstate.[9]

We conclude that *Shapiro* stands for the proposition that a rule penalizing travel requires a justification of a compelling state interest. However, it would seem that *any* durational or residency requirement would penalize persons who have recently exercised their right to

---

8. The term "deterrent" is not precise. We assume that the concept is used to mean a penalty with preventive effect. Thus defined, deterrence can exist only if there is a measurable impact. Precisely what that impact must be is unclear. *See* note 9 *infra*.

9. One commentator, however, has concluded that the Court did mean the critical test to be the deterrent effect on travel, noting that a penalty criterion would cut too broad a swath, rendering suspect all residential and durational requirements. Note, Shapiro v. Thompson: Travel, Welfare and the Constitution, 44 N.Y.U. L.Rev. 989, 1000–1003 (1969). We treat the supposed overbreadth flaw of the penalty approach in our text, *infra*.

The positive case made for a deterrent test rests on reading *Shapiro* as conclusively presuming deterrence of travel if a residency requirement deprives persons of the basic necessities of life. Such an approach would clearly validate a durational prerequisite for voting, *id.* at 1005–1008, and make suspect one for an occupational license, *id.* at 1008–1010. But when the commentator, perhaps responding to the hint in *Shapiro* at note 21, defends residency requirements for obtaining low or free tuition at state universities despite the assumed essentiality

of higher education, *id.* at 1010–1012, the conclusive presumption approach falters. The additional empirical assumption is made that while *some* poor families would be deterred from travel by higher tuition, the number would be relatively small.

Because the Court has shown no inclination to look to the difficult factual issue of whether or not a fixed level of deterrence exists and because it does not restrict its ruling in *Shapiro* to situations where the necessities of life are involved, we are inclined to reject this commentator's presumption of deterrence and adopt instead the Court's suggestion that restrictions which penalize travel require a compelling state interest. Laws which penalize the exercise of a constitutional right are generally suspect. *E. g.*, Sherbert v. Verner, 374 U.S. 398, 406, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963). Moreover, deterrence is a misleading term. Neither the commentator nor the Court in passing, make clear whether deterrence means at least one person is deterred, a significant number of people are deterred, or everyone is deterred. If deterrence is used to mean at least one person is deterred, then the concept of deterrence is functionally equivalent to a penalty.

travel by denying them benefits granted to other residents. How can this be reconciled with footnote 21 in *Shapiro*, 394 U.S. at 638, 89 S.Ct. at 1333, which says that some such requirements may be justified because they either promote a compelling state interest or "may not be penalties upon the exercise of the constitutional right of interstate travel"?

■ The answer, we think, lies in the Court's concept of the right to travel. The Court apparently uses "travel" in the sense of migration with intent to settle and abide.[10] *See* Note, Shapiro v. Thompson: Travel, Welfare and the Constitution, 44 N.Y.U.L.Rev. 989, 1012 (1969). Thus, laws that comparatively disadvantage persons traveling to take advantage of state benefits and then leaving are permissible under *Shapiro*. For example, the Court suggested that residency is a reasonable requirement for eligibility to receive welfare benefits but that the one-year waiting period was unconstitutional. *Shapiro, supra* at 636, 89 S.Ct. 1322, 22 L.Ed.2d 600. Any residency requirement might be thought to penalize the right to travel if "travel" is used in the sense of movement. A resident of Maine vacationing for a month in New Hampshire might be penalized for traveling if he could not obtain the benefits of a library card in New Hampshire during his vacation. Nevertheless, a residency requirement so "penalizing" that kind of travel is probably permissible under *Shapiro*.[11]

Under this reading of *Shapiro*, we need only to ask if the two-year residency re-

quirement penalized persons because they have recently migrated to Newport. Normally, persons eligible for public housing have only to sign up and wait six months for a vacancy. Plaintiffs were required to wait two years before they could be placed on the six-month waiting list. During that time, they were forced to live in substandard housing. Using "penalty" in what appears to be the right context, i. e., not in the sense of a criminal or civil sanction, plaintiffs and others in their class can truly be said to suffer "disadvantage, loss or hardship due to some action".[12]

As a result of penalizing the right to travel, the Authority can successfully defend its residency requirement only by demonstrating that the requirement furthers a compelling state interest. We turn now to a consideration of the interests which the Authority urges justify the discrimination.

The Authority, in the district court, advanced two propositions. It argued first that the public housing program would not be supported by the voters if "the more and better housing they build, the more they would attract low income families from neighboring communities which have no public housing", forcing the long-time residents "to pack up and move on". Moreover, since residents of neighboring Middletown would "move over into Newport just to get this housing, * * * there is absolutely no reason for Middletown to get into the construction of low rent housing when a neighboring community is taking care of

10. *Cf.* Truax v. Raich, 239 U.S. 33, 39, 36 S.Ct. 7, 60 L.Ed. 131 (1915).

11. We do not think, for example, that Newport is required to convert its public housing into motel facilities for transients. A requirement that persons applying for public housing have a bona fide intent to reside in Newport would be permissible.

12. Webster's Third New International Dictionary, 1966. Under other interpretations of *Shapiro*, the requirement of a compelling state interest is also triggered by the circumstances of this case. Adequate housing is a necessity of life. If

infringement of necessities of life by residency requirements results in a conclusive presumption of deterrence, *see* note 9 *supra*, we would find that this requirement had a deterrent effect. Even without the benefit of the presumption we would find a probable deterrent effect—as the Court seems to have done in *Shapiro* without any empirical data. In plaintiffs' class, we are sure there are persons who would be deterred from migrating to Newport by the prospect of at least two years in overcrowded and expensive private housing. *See* note 3 *supra*.

their needs". This objective is perfectly understandable. It is the centuries old, settlement law predisposition to "take care of our own—and no one else's". Phrased another way, the purpose is to discourage "outsiders" from moving in. But this purpose—"of inhibiting migration by needy persons into the State is constitutionally impermissible". *Shapiro, supra,* at 629, 89 S.Ct. at 1328.

The second reason offered in support of the residency requirement was that the two-year waiting period is useful in planning. The planning objective was justified to the district court as simply based on the need to know "there is this group in the community". Such a justification depends on the assumption that a community makes a plan for a permanent facility on the basis of the ascertained needs of the year in which the planning is done. This would mean that Newport in 1970 would plan for a facility to be available for occupancy in 1973 or 1974 on the basis of those in need in 1970. There is no evidence that this is the case. Were "the people who are here" the sole datum for planning, the Authority, planning in year 1 for year 4, would be blind to the net impact of in and out migration of years 2, 3, and 4, not to mention subsequent years. Were it to plan for relocation of all the population of a slum clearance area, a new arrival in that area would be "planned for" and yet be ineligible for public housing for two years. Moreover, the two-year hiatus imposed on new arrivals deprives the Authority of data vital to its intelligent forward planning. Finally, we observe that the relevance of the durational requirement to planning is no greater here than in *Shapiro, supra* at 635, 89 S.Ct. 1322.

On appeal the Authority seemingly abandoned these arguments to contend that the durational requirement in many communities where public housing survives with difficulty is "often the key to survival of such housing". This argument is sophisticated. It proceeds on the assumption that the presence or absence of a durational residency prerequi-

site for eligibility for public housing has in fact nothing to do with the motivation of people to migrate. But it nevertheless asserts that the voters *feel* that abolition of the requirement will serve as a magnet and that therefore they will vote down all new applications if they think that newcomers will benefit to the prejudice of long-time residents. We are confronted with the assertion that if the two-year durational requirement were declared invalid, "voters in city governments elsewhere as well as at Newport would simply not approve new low-income public housing." Thus, the purpose and effect of the requirement are not to impair the right to travel, but to make the voters *think* the right to travel is being impaired, even though it is not.

For this argument we have no documentation except a catalogue of reasons, the obstacle race which every public housing project must run—lost taxes on the property dedicated to such housing, higher taxes, lower municipal borrowing authority, the loss of attractive real estate, the increasing burden on schools, etc. That public housing has been and continues to be a controversial issue is obvious. But missing from this catalogue is any suggestion of evidence that voters turn against public housing if they think newcomers will share the facilities on a basis of parity with old residents.

Beyond this we face two underlying flaws of this contention: first, that we should acknowledge as a legitimate interest of a state or local government a belief based on what the Authority contends is an illusion. The fact that people may feel that outsiders will move in may well be a realistic consideration. But pandering to that mistaken assumption is a goal which we cannot recognize as compelling. Second, such a goal, if legitimate, would rationalize discriminatory classifications which are constitutionally impermissible. The Supreme Court had a similar problem in *Shapiro*. It acknowledged that "perhaps Congress could induce wider state participation in school construction if it authorized the use of

joint funds for the building of segregated schools." 394 U.S. at 641, 89 S.Ct. at 1335.

There is one final argument which could be but was not made. Putting the community's interest in a two-year residency requirement in the most favorable light, one could urge that it is reasonable for a municipality to give preference to its older residents, not to discourage outsiders from moving in, but to recognize those who have a prior claim on its charity. This facially appealing proposition does not withstand analysis. The "prior claim" cannot rest on any past tax contributions which longer term residents may have made to the community. *Shapiro, supra* at 632–633, 89 S.Ct. 1322. It cannot, as we have noted, rest on the supposition that it was only the established resident for whom public housing was planned. What remains is the sentiment that any person who has resided in Newport for more than two years is more a part of the community than a newcomer and has a higher claim to its bounty. But such a value judgment would, as the Court noted in reference to the past contributions argument, "logically permit the State to bar new residents from schools, parks, and libraries". *Shapiro, supra* at 632, 89 S.Ct. at 1330. Moreover, such a sentiment is particularly inappropriate for Newport which devotes forty per cent of its public housing to service personnel who are exempted from any durational requirement. Finally, such a vague sentiment, even if permissible, does not rise to the level of compelling state interest.

Even by a standard of rational relationship to a permissible goal, we doubt that the justifications put forth by the Authority could withstand judicial scrutiny. The goal of preventing an influx of outsiders is constitutionally impermissible. The residency requirement is not rationally related to the goal of planning. The objective of achieving political support by discriminatory means or by nourishing an illusion that means discriminate is not one which the Constitution recognizes. Nor do we believe the

goal of promoting provincial prejudices toward long-time residents is cognizable under a Constitution which was written partly for the purpose of eradicating such provincialism. Certainly none of these interests counterbalances the fundamental individual right involved.

The Authority, in addition to its substantive arguments, claims that summary judgment was improper since various issues of material fact existed; namely, whether one of the plaintiffs was in fact prejudiced financially by her rental in the private market, whether that market was inadequate, whether the residency requirement does in fact "fence out" low income families from other states, and whether abolition of the residency requirement is likely to deter the building of additional public housing. For reasons already expressed, we deem these issues either foreclosed by the record below or irrelevant to the resolution of this appeal.

Affirmed.