**Willie Gean STINGLEY, Plaintiff,**

v.

**CITY OF LINCOLN PARK et al., Defendants.**

**Civ. No. 74–72446.**

United States District Court, E. D. Michigan, S. D.

April 20, 1977.

**1380**

Clarice Jobes, Detroit, Mich., for plaintiff.

Stanley E. Beattie, James V. Bellanca, Jr., Harper Woods, Mich., for defendants.

## OPINION

GUY, District Judge.

In making the findings of fact and conclusions of law that are required by Rule 52, it is helpful if this case is analyzed from three viewpoints. First, the facts as to the conduct of the plaintiff in this litigation as they relate to her legal theories; second,

the history of the City of Lincoln Park's efforts and actions relative to its public housing projects, and thirdly, the applicable law.

The plaintiff is a black woman under thirty years of age who is divorced and a mother of three daughters under ten years of age. She has lived in the Detroit area all her life, growing up in southwest Detroit where she completed high school and then continued on to the University of Detroit for two years of advanced education. Plaintiff has a medical condition which either prohibits or limits her opportunity to be gainfully employed. Accordingly, all of plaintiff's income is derived through public assistance or support monies received from a former husband. The total of these sums is approximately $512.00 per month.

In 1973, and for some time prior thereto, the plaintiff had been living in a HUD home in the City of Detroit which was being re-possessed because she had failed to make mortgage payments. Plaintiff was finally compelled to leave the premises in question and move in with her mother. Subsequent to moving in with her mother, plaintiff contacted the Detroit office of Housing and Urban Development and inquired as to federal public housing projects or federally subsidized public housing projects within the Detroit area. Plaintiff learned at this time that the City of Lincoln Park had federally subsidized public housing. Plaintiff, as a child, although living in Detroit, had lived near Lincoln Park and the family had frequently shopped in Lincoln Park. The plaintiff felt that she would like to live in Lincoln Park and made the decision to make inquiry of the availability of public housing within that city.

On or about June 6, 1973, the plaintiff contacted the Department of Community Development and Improvement for the City of Lincoln Park and learned that there was a residency requirement in connection with eligibility for public housing within the City of Lincoln Park. Plaintiff was told that she could apply but, if not a resident, her application would not be processed. The next day, June 7, 1973, the plaintiff went to the City of Lincoln Park, talked to a secretary or receptionist and filled out an application for public housing. The plaintiff also on this date was interviewed by Troy Alley, the Director of Community Programs for Lincoln Park, who determined that the plaintiff met the income limitation requirements for occupancy in Lincoln Park's public housing but did not meet the residency requirement. At this particular time, the City of Lincoln Park had a three-year residency requirement.

Plaintiff indicated immediately her dissatisfaction with the response she had received from Lincoln Park officials and further indicated she felt that their residency requirement was illegal. Immediately upon leaving the City of Lincoln Park, the plaintiff called the Detroit office of HUD and was told she could make a complaint. The plaintiff did make a complaint with HUD.

Plaintiff also alleges that subsequent to filing the complaint with HUD, she attempted to find private housing within the City of Lincoln Park so that she could become eligible as a resident of Lincoln Park for their public housing. Plaintiff claims to have made at least ten efforts to find housing in Lincoln Park, which efforts consisted in looking in the want ads in Detroit newspapers, checking supermarket bulletin boards in Lincoln Park where there are sometimes houses listed for sale or rent, and driving around the community. Plaintiff testified that on one occasion she stopped at an apartment building and said no one answered the door. She further claims that on another occasion she made an inquiry and was told that they would not rent to blacks.

On or about March 22, 1974, the plaintiff was informed by the Regional Office of HUD that her administrative complaint had been closed on January 18, 1974, and that no basis for action had been found. Plaintiff again contacted the City of Lincoln Park relative to her application, and on March 25, 1974, was again told by the City of Lincoln Park that she did not meet the residency requirements. On or about June 7, 1974, plaintiff filed a second administra-

tive complaint with HUD alleging, in essence, the same facts that had been alleged in her first complaint. Approximately two weeks later, on June 19, 1974, plaintiff also filed a complaint with the Michigan Civil Rights Commission charging a violation of the Michigan State Fair Housing Act of 1968. On August 12, 1974, plaintiff received, via her attorneys, a call from the Regional Office of HUD in Chicago informing them that the second complaint had been closed also. On September 18, 1974, the present action was instituted in this court.

In addition to her own testimony, plaintiff also introduced the testimony of a census tract expert. Primarily, this witness testified to the fact that between 1950 and 1970, the population of Lincoln Park approximately doubled, but the black population, which was almost non-existent, remained the same. This witness also testified to the fact that that portion of Detroit adjacent to the City of Lincoln Park during the same period of time had not increased in population but had gone from a mixed black and white area to an area that was almost exclusively black. In addition, two neighboring communities, the City of Ecorse and the City of River Rouge, had substantial black populations but they had essentially remained in certain sections of the city and were not scattered throughout the census tracts comprising the communities as a whole. After this statistical information was given, the witness testified on cross-examination that she could not give any definite reason why a given area was black insofar as its population was concerned. She indicated there were any number of reasons contributing to the racial makeup of a given area, some of which she felt qualified to testify on and others which she didn't. Thus, plaintiff's request for relief is essentially premised on two arguments: first, that the City of Lincoln Park's durational residency requirements are illegal per se and, thus, plaintiff is entitled to relief; or, in the alternative, plaintiff's residency requirements are merely a subterfuge due to the virtually all-white makeup of the city and have the effect of "subject-

ing a person to discrimination because of race." In order to have a frame of reference within which to evaluate plaintiff's claims, it is helpful to now examine the history of public housing within the City of Lincoln Park.

This history was detailed for the record through the testimony of Emanuel Gorland, the past Community Improvement Director and Housing Commission Secretary for the City of Lincoln Park. Mr. Gorland first became employed by the City of Lincoln Park in April of 1966. At that time, the City of Lincoln Park had no public housing, but as was typical of many cities in that period of time, had commenced action in connection with an urban renewal project. In connection with the urban renewal project, the city had an application and program reservation for public housing units to be used in connection with relocation for those displaced from the urban renewal projects in progress. It was estimated that 350 persons would be displaced by such urban renewal projects. The initial public housing application and program reservation involved 100 units of multiple housing to be occupied by senior citizens and 50 units of scattered site housing. The senior citizens project was to be a high-rise building, and the scattered site, non-elderly housing accommodations were to be individual homes built at various locations throughout the city. The city ultimately erected the high-rise project for the elderly, subsequently modified to contain 108 units, and built fifteen scattered site houses as their initial project. The city built three one-bedroom units, four two-bedroom units, six three-bedroom units, and two four-bedroom units. The public housing being provided by the City of Lincoln Park was part of the coordinated plan in connection with the urban renewal land which primarily was to be used after clearance for the development of moderate income, private multiple housing. At this particular point in time, Lincoln Park was a community on which all vacant land suitable for multiple dwellings had already been built upon, and the only available land was that which

would come about as a result of urban renewal clearance.

As these projects continued, the city made application for the funds to build the other 35 scattered site housing units contemplated. They were told by HUD, on August 27, 1970 (Exhibit 13), that there were no further funds available. The City of Lincoln Park at this juncture enlisted the aid of their congressmen, and from 1970 to 1972, a series of correspondence was exchanged (Exhibits 14, 15, 16 and 17) between the city, HUD and Congressman Ford, all of which was to no avail. No money was ever obtained to this date for the construction of the additional 35 units, notwithstanding that the public housing authorized in conjunction with the original urban renewal clearance program would be insufficient to even meet the estimated needs of those displaced by urban renewal action.

Insofar as project eligibility requirements were concerned, this subject had been discussed between the City of Lincoln Park and HUD officials almost from the outset of the projects in question. The original proposal of the City of Lincoln Park was that eligibility should be conditioned upon an applicant having been a resident of the City of Lincoln Park for five of the last seven prior years. HUD's response to this proposal as evidenced by a May, 1968 letter (Exhibit 8) was to recommend to Lincoln Park that they make residency a preference factor rather than an eligibility factor. On May 21, 1968 (Exhibit 9), Lincoln Park replied to the effect that since they have so many more applicants than units available, why set up a preference factor which would, in essence, require them to process applicants who in effect would never be able to get into one of the units. It would be a drain on the limited manpower that was available. HUD agreed and on May 24, 1968 (Exhibit 10), the occupancy requirements as submitted by the City of Lincoln Park were approved. In June of 1968, the Housing Commission of the City of Lincoln Park formally adopted the aforementioned occupancy policies insofar as

they affected the senior citizens project (Exhibit 11). In October of 1969 (Exhibit 12), HUD, by letter, formally approved the occupancy policies for the scattered site housing which, in effect, were the same as the occupancy requirements for the senior citizens housing. In April of 1973, the city reduced residency requirements from five to three years.

In June of 1973, at approximately the same time that plaintiff first made application for occupancy to this policy, HUD communicated with the City of Lincoln Park (Exhibit 18) to inform them of certain Supreme Court decisions which had been rendered concerning "durational residency" requirements. It was suggested that the City of Lincoln Park review their requirements in light of these decisions. One week after receiving this letter, the City of Lincoln Park wrote to HUD and asked for additional clarification relative to the whole question of "durational residency." By this date, of course, plaintiff had already filed her administrative complaint with HUD and it was pending. HUD did not formally answer the June 28, 1973 letter of the City of Lincoln Park until September 13, 1974. The reply strongly urged that the city make residency a preference factor rather than an eligibility factor.

During this period of time, the complaint of the plaintiff with the Michigan Civil Rights Commission was also pending, and on October 31, 1974, by agreement between Lincoln Park and the Michigan Civil Rights Commission, it was agreed that the durational residency requirement would be reduced from three years to thirty days. Exhibit 25 represents the agreement between the city and the Michigan Civil Rights Commission in this regard. The agreement also specifically contains a disclaimer as to the finding of any discrimination insofar as plaintiff's complaint is concerned.

It is also significant that the drying up of the federal funds which resulted in Lincoln Park building far fewer units of public housing than they had contemplated has also resulted in a demand and turnover rate which is of some significance insofar as this

litigation is concerned. If plaintiff's application had been accepted on June 7, 1973, when she first applied, she would have been placed on the waiting list for one of four two-bedroom units within the community. If she had gone on the list on that date, she still would not be living in one of those units. There has been only one turnover since that date, and it was filled by an applicant whose application went back to August, 1972, and who had also been displaced by public action from the home in which she had been living, thus giving her top priority in connection with occupying one of the public housing units. At the present time, the waiting list for two-bedroom units goes back to September 4, 1969, and there are approximately thirty names currently on the waiting list.

The private development of moderate income housing on cleared urban renewal land that was going on concurrently with the development of public housing within the City of Lincoln Park also has some relevance to these matters. The principal information relative to the development of the private housing came through the testimony of Wendell Addington, a housing consultant and developer who developed one of the projects on cleared urban renewal land within the City of Lincoln Park. Mr. Addington is an individual with considerable experience in the field of federally assisted housing, having been involved with the development of some 25,000 units in several different states.

Two private projects have been built on cleared urban renewal land in Lincoln Park. The first is known as Village Green and was available in late 1973 or early 1974 for public occupancy. Village Green has fifteen to twenty percent non-white occupancy and rents are somewhat lower than in the Park Plaza, the second housing development and the one with which the witness, Wendell Addington, was connected.

Park Plaza was originally contemplated as a Section 220 federally assisted housing project; however, due to the high interest rates that HUD funds were carrying at the time the project was contemplated, it was not feasible to proceed on that basis and, instead, the developers borrowed from the Michigan State Housing Commission. The Michigan State Housing Commission loan, as would a HUD loan or grant, carried with it an affirmative action requirement. In this regard, the developer had originally contemplated a five to ten percent minority occupancy and, at the request of the state, this was raised to a fifteen to twenty percent minority occupancy rate. At all times the City of Lincoln Park, the seller of the land in question, was aware of these affirmative action requirements and cooperated fully with the development. In fact, the developer testified that he has developed housing projects in four communities in the immediate area of Lincoln Park and that the officials of Lincoln Park were the only ones who raised absolutely no questions relative to open occupancy policies.

Park Plaza was constructed in 1975 with occupancy beginning in 1976. Prior to the development of the project and during the time the land was vacant, there were signs on the site indicating what was to be developed and when and soliciting applicants. As a result of these signs, the city furnished to the developer a list of 196 names of parties who had expressed interest in living in this development. Such list of names included both black and white individuals. To this list, the developer added 100 names of his own who had inquired about occupancy in the project and sent out initially 350 letters for a preview showing of the project. Letters were sent to minority organizations as well, and about 200 persons, of whom two-thirds were black, attended the opening preview. Subsequent to rental units becoming available, 160 units have been rented to date, of which 88 such rentals are to blacks.

Mr. Addington testified that in this project there would be about twenty apartments that would be available and suitable for the plaintiff. Mr. Addington did indicate, however, that although the plaintiff has sufficient income to qualify to live in the apartment, it would probably be somewhat difficult for her to meet all her utility

expenses. In this regard, however, the court notes that the utility expenses referred to where the plaintiff is currently living are greatly in excess of those quoted for the Park Plaza development, and plaintiff is currently allocating at least as much to housing as would be required of her in the Park Plaza development.

Mr. Addington also indicated that apartments are rented on a one-year lease basis, and he expected a turnover rate of 20 to 30 percent a year. He also indicated that rent subsidies from HUD have been applied for under Section 8, and there has been no word received as yet. If rent subsidies are approved, those who qualify would only pay twenty percent of their income toward the rent regardless of what the income would be. Forty units within the Park Plaza development are earmarked in connection with the rent subsidy application.

With this factual background then, it is now necessary to examine plaintiff's legal theories. Plaintiff seeks relief under a variety of constitutional and statutory provisions relating to discrimination. Whether such pleading stems from an excess of caution or whether plaintiff genuinely feels entitlement to relief under all the sections pleaded, it is difficult to ascertain. It is clear, however, as will be elaborated on further herein that in her proofs, and in argument of counsel considerably more reliance was placed on Title VIII of the Civil Rights Act of 1968, as amended, 42 U.S.C. § 3601, et seq., than any other of the sections relied upon by the plaintiff.

■ In addition to Title VIII, plaintiff also claims reliance upon Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d, et seq., the Thirteenth and Fourteenth Amendments to the United States Constitution, and Title 42, United States Code, Section 1982. Were all of these sections merely different ways of making the same claim, there would not be a problem. Such is not the case, however, as the cases have indicated and as plaintiff concedes, the burdens are different under certain of these sections. Although this is an area fraught with complications about which much has been written and undoubtedly much more will be written by the courts, suffice it to say that in terms of plaintiff's equal protection argument, the Thirteenth and Fourteenth Amendments to the United States Constitution, and Section 1982 of the Civil Rights Act of 1866, 42 U.S.C. § 1982, all require that there be some showing of a racially discriminatory intent. Plaintiff concedes this, and, indeed, one need look no further than the most recent decision of the Supreme Court in *Village of Arlington Heights, et al. v. Metropolitan Housing Development Corporation, et al.,* —— U.S. ——, 97 S.Ct. 555, 50 L.Ed.2d 450. In the *Arlington Heights* decision, the Supreme Court stated: "Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause." *Id.* at ——, 97 S.Ct. at 563. The recent Supreme Court decision in *Washington v. Davis,* 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976), is also relevant in this regard and is cited by the Supreme Court in the *Arlington Heights* case.

■ It is clear, on the other hand, that Title VIII does not require a similar showing of intent. In this regard, Title VIII has been interpreted to be governed by the same standards that are applicable to the Title VII employment discrimination cases. A concise statement of the burden placed upon plaintiffs under Title VIII can be found in *United States v. City of Black Jack, Missouri,* 508 F.2d 1179 (8 Cir. 1974):

"The burden of proof in Title VIII cases is governed by the concept of the 'prima facie case.' *Williams v. Matthews Co.,* 499 F.2d [819] at 826 [8 Cir.]. To establish a prima facie case of racial discrimination, the plaintiff need prove no more than that the conduct of the defendant actually or predictably results in racial discrimination; in other words, that it has a discriminatory effect. (Case citations omitted) The plaintiff need make no showing whatsoever that the action resulting in racial discrimination in housing was racially motivated."

*Id.* at 1184–85.

Insofar as Title VI of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000d, et seq., is concerned it is difficult to evaluate the role it should play in this litigation if any. Other than pleading this section, plaintiff has offered no specific proofs relative to its provisions or the plaintiff's relation to the provisions of this Act. Further, at oral argument, plaintiff's counsel for all practical purposes abandoned Title VI when she made the statement that she doubts if the plaintiff has an independent cause of action under Title VI. In any event, since this is a housing case, it is difficult, if not impossible, to see how plaintiff would have any rights pursuant to Title VI not found in the much more specific Title VIII.

With the foregoing differences relative to burden of proof in mind, the court will first examine that portion of the plaintiff's claim which requires for relief that there be a showing of a racially discriminatory intent. In this regard, the court reaches the conclusion that there has been a total absence of any proofs relative to a racially discriminatory intent on the part of the defendant, and accordingly, rules that the plaintiff cannot prevail under this theory of recovery.

The testimony shows that the City of Lincoln Park first became involved in public housing as a result of their urban renewal program with their public housing being initially a response to their relocation requirements and responsibilities under their urban renewal program. Since Lincoln Park is, and at all times since its incorporation, has been almost exclusively an all white community, there is no claim of any racial animus in connection with the urban renewal project as such. It is clear that its purpose was to remove old and dilapidated structures and, in general, to upgrade the community. It had another purpose, however, which is more relevant to this litigation. The land being cleared was being earmarked for the development of private and public multiple housing. The evidence shows that there is a conspicuous lack of multiple dwellings within the City of Lincoln Park, and further, that all land is basically built upon and that it would only be through a clearance project that land could be made available for multiple dwellings.

■ In connection with the public housing aspect of the clearance project, the City of Lincoln Park, as indicated earlier in this Opinion, contemplated a senior citizens housing project and some scattered site housing. The *primary* usage of the cleared land, however, was to be for *private* moderate income housing. In that regard, the city did not control or engineer the development of the cleared land in any way that could be said to further the status of the community as all white. On the contrary, a contest was held, the winner of which was to be awarded the right to develop the property. It was clear that the developer of the property would rely on either federal or state assistance and that an affirmative action program would be required in connection with the development of the property. Thus, insofar as the city is concerned, the usage to which they determined to put the cleared urban renewal land was the first positive step taken within the community to ensure that there would be a substantial increase in minority residents. As has been detailed earlier, this, in fact, has been the result. Through the development of this urban renewal land, the City of Lincoln Park guaranteed that the black population of Lincoln Park would increase more by a considerable degree in one year than it had increased in the previous thirty years. The court reaches the conclusion that the entire clearance and redevelopment program of Lincoln Park must be observed as a whole, and, as such, it had a significant affirmative action impact insofar as black residency within the City of Lincoln Park is concerned. This is further buttressed by the fact that the city played an active party in furnishing the developer with the names of black applicants who became aware of the development of the private project and made inquiry with the city. The only contrary evidence of intent offered by the plaintiff was to show that Lincoln Park like almost all Detroit suburbs, has been predominantly white and

that in the Detroit metropolitan area, with the exception of one or two municipal enclaves, the black population is concentrated almost entirely within the City of Detroit. Where intent is an element, this generalized type of statistical showing, although relevant, is not sufficient to outweigh the specific affirmative action taken more recently by the city officials who are defendants in this litigation.

The court will now proceed to examine plaintiff's proofs under Title VIII where, as was stated in *Banks v. Perk*, 341 F.Supp. 1175 (N.D.Ohio, E.D.1972): ". . . discriminatory actions may be judged by their effect, and not necessarily by an actual intent to discriminate." Even under this burden of proof that is easier to meet, the court is of the opinion that the plaintiff has failed in her proofs. In order to fully understand plaintiff's contentions in this regard, it is necessary to take another look at her argument in its entirety. When plaintiff first approached the City of Lincoln Park relative to her eligibility for their public housing, she was told there was a three-year residence requirement. There is no doubt that a three-year durational residency requirement is not permissible. *Cole v. Housing Authority of City of Newport*, 435 F.2d 807 (1st Cir. 1970). Plaintiff's complaint to the Michigan Civil Rights Commission coupled with HUD notifying the City of Lincoln Park of court decisions relating to durational residency requirements resulted in the city lowering its three-year requirement to thirty days. Whether thirty days would be a durational residency requirement which is constitutionally permissible or not is a question that the court does not reach in this case for the reasons set forth herein. There is enough decisional authority on durational residency requirements that this court will not add unnecessarily to that volume of literature. Significantly, however, all of the cases which have been cited to the court by the parties or which the court has found on its own research in which a durational residency requirement was attacked successfully, the plaintiff was in fact a *resident* of the area in question. The plaintiff in this case

was not at the time of application a resident of the City of Lincoln Park, nor has she been any time since then. Further, none of the cases, including *Shapiro v. Thompson*, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), have indicated in any way that a bona fide residency requirement would not be permissible. In *Cole, supra,* the court indicates at footnote 11, at page 811: "A requirement that persons applying for public housing have a bona fide intent to reside in Newport would be permissible." In *Green v. McKeon*, 468 F.2d 883 (6th Cir. 1972), the court concluded its opinion by stating:

"We emphasize, as did the court in *Dunn v. Blumstein,* 405 U.S. 330, 92 S.Ct. 995, 31 L.Ed.2d 274 (1972), that the provision at issue is a *durational* residency requirement. Plymouth is not precluded from requiring its officials to be bona fide residents, as determined by appropriately defined and uniformly applied standards. However, the city may not require that candidates for city office must *have been* bona fide residents for two years prior to election day." (Emphasis in original text)

*Id.* at 885.

Although *Green v. McKeon* did not involve housing, it is typical of what the cases that deal with housing have held relative to residency requirements. See, for example, *King v. New Rochelle Municipal Housing Authority,* 442 F.2d 646 (2nd Cir. 1971), which stated:

"In reaching our conclusion, we emphasize that we are here deciding only the validity of a durational residency requirement for admission to public housing. As in *Shapiro,* there is no contention here that a state or local government may not require that applicants for public services be *bona fide* residents. Nor do we suggest any opinion as to the validity of other durational residency requirements, many of which assuredly do promote significant state interests." *Id.* at 649.

The court does not conclude, however, that because plaintiff was not a bona fide resident at the time of application she is

automatically precluded from attacking the residency requirement in dispute here. If, in fact, the residency requirement has the effect of making the plaintiff as a non-resident a victim of racial discrimination, she may still seek relief. This relief would have to be premised on the proposition that the residency requirement is really a subterfuge due to the fact that the City of Lincoln Park is predominantly a white community. Thus, plaintiff would argue that as a black she cannot find housing within Lincoln Park and thus could never meet a residency requirement. To that end, as outlined, *supra,* the plaintiff claims to have made unsuccessful attempts to find housing within the City of Lincoln Park. The court finds such attempts at proof unpersuasive, however, and finds to the contrary that plaintiff made no genuine effort to find private housing within the City of Lincoln Park. On the contrary, the court reaches the conclusion that the plaintiff was prepared from the outset to challenge the Lincoln Park residency requirements as a matter of law and never had any intent to move into the city as a bona fide resident. Her testimony was not convincing relative to her efforts to find housing. She vaguely referred to some ten efforts to find housing in Lincoln Park with no specification as to precisely where or when. At no time did she contact a real estate office. At no time did she read any of the Lincoln Park or area newspapers, notwithstanding that she indicated she had grown up near Lincoln Park and was familiar with the area. Defendants introduced copies of the local newspapers from May to July, 1973 indicating that there were numerous houses and apartments for rent or lease, many of them at prices below what plaintiff was paying for rent and utilities at her current home. At no time did she make inquiry relative to occupancy in the Village Green Apartments (although the parties agree that the Village Green Apartments would not, in fact, have taken children). At no time did she make inquiry relative to the Park Plaza project, notwithstanding that several hundred others did, the majority of whom were black.

There were also inconsistencies in plaintiff's testimony. At one point she indicated she had no way of getting around Lincoln Park to look. At another time, she stated that when she *drove* to Lincoln Park to shop in the supermarkets, she would look on supermarket bulletin boards. Relying on supermarket bulletin boards as one's primary source of house hunting is not, in the court's opinion, evidence of a bona fide effort to become a resident of a community. It must be remembered in this regard that plaintiff, although under some economic duress, is an intelligent and educated woman who gave the court the impression while testifying of being an extremely competent individual who possessed the necessary skills, knowledge and intelligence to find housing in Lincoln Park if she so desired.

Plaintiff's frame of mind is further indicated by the fact that on the first date she had contact with Lincoln Park officials she indicated that she would not accept their response relative to her ineligibility and intended to take legal action which course of action she instituted immediately by filing a complaint with HUD the same day. This of course, was plaintiff's prerogative, and nothing herein is intended to indicate that this was other than proper conduct on her behalf. It does tend to indicate, however, that her efforts to find housing and become a Lincoln Park resident were not her prime objective insofar as securing occupancy in Lincoln Park's public housing was concerned.

In addition to this factual finding, the court also determines that plaintiff has failed to establish a prima facie case as that term has been defined in Title VII litigation. Plaintiff contends that a prima facie case has been established by the use of statistics. The only statistics offered were those of the census expert who indicated that Lincoln Park, as of 1970, was almost an entirely white community and had remained such over a period of thirty years. There are several problems with such generalized use of statistics if, in fact, this type of testimony actually qualifies as statistics.

The first is that the question is not how many black residents there were in Lincoln Park in 1970, but whether the Lincoln Park Housing Commission residency requirement is a subterfuge designed to keep out black residents from its housing development. Thus, the statistics are remote in time and also totally ignore the recent efforts of the City of Lincoln Park which are of relevance in this case. As the court has indicated, *supra*, the city has embarked upon a total redevelopment program in connection with its urban renewal lands which has had significant impact on the community insofar as increasing the amount of black residency within the city is concerned.

Plaintiff also rather loosely relies upon the case law that has been enunciated in class actions relative to the establishment of a prima facie case. It is clear that in such cases as *Rodriguez v. East Texas Motor Freight,* 505 F.2d 40 (5th Cir. 1974), and *Stewart v. General Motors Corporation,* 542 F.2d 445 (7th Cir. 1976), that the appellate courts have indicated that a prima facie case in a class action may be established by the use of statistics alone. (It should be noted that certiorari has been granted in *Rodriguez* and has been applied for in *Stewart.*) In cases where there is only an individual case, such as the one at bar, however, the standard is still that enunciated in *McDonnell Douglas Corporation v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Under the *McDonnell Douglas* rationale, a statistical inquiry is relevant only after the plaintiff has established a prima facie case that he or she has in fact been discriminated against; that he or she has applied for a position, was qualified, was rejected, and thereafter the employer continued to seek applicants with his or her qualifications. Plaintiff fails to meet this test. First, she was not in fact qualified since she was not a resident of the City of Lincoln Park. Secondly, to this date, even if qualified, she would not have yet been occupying one of the dwellings in question due to prior applicants and priorities to be given to those who have been displaced by other public action.

Again, resorting to the Title VII analogy, even if it would be said that plaintiff had made a prima facie case, the defendant has in fact shown a valid non-discriminatory reason for its action. Specifically, the housing projects in Lincoln Park are part of their total community redevelopment plan which includes considerable additional housing specifically earmarked for minority residents. The City has an additional obligation, however, to provide housing for those that they have displaced by public action, and the scattered site housing provided is in partial fulfillment of this responsibility. The redevelopment program viewed as a whole shows a thoughtful plan which gives full recognition to the city's affirmative action responsibilities insofar as minority housing is concerned.

Having thus reached the conclusion that even under the more relaxed standards of proof required under Title VIII the plaintiff has failed in meeting her burden of proof and thus is not entitled to recovery, the court feels nonetheless that it should comment further on plaintiff's right to relief under a Title VIII theory.

Although not raised as a matter of defense by the defendants, it appears to the court that the plaintiff has wholly failed in a number of different aspects in meeting the jurisdictional prerequisites to bringing a Title VIII action. Since this goes to the jurisdiction of the court, it is permissible for the court to raise this issue *sua sponte* even though not raised by the defendants.

Title VIII, like Title VII, has numerous provisions and requirements relating to administrative action being taken prior to the institution of suit. Congress intended that there be full opportunity given to resolve these disputes administratively and by conciliation rather than resort to the courts. Further, Congress equally clearly indicated that where a state had adequate operative machinery of its own for the resolution of such disputes that it was not the intent of Congress to supplant such state machinery. In this regard, the following requirements of Title VIII are of significance to this matter. Section 3610 of the Act provides

that an aggrieved person may file a complaint with the Secretary of Housing and Urban Development within one hundred and eighty (180) days after the alleged housing practice occurred. Since the Act uses the word "may" it is obvious that this is a discretionary course of action insofar as an aggrieved person is concerned. Plaintiff elected to proceed in this manner, however, and did in fact file such a complaint on the same day that the alleged discriminatory housing practice occurred. This section further provides that if the complaint appears to state facts which constitute a violation of any state or local fair housing law and there is a state agency charged with the enforcement of such state or local housing law, that the Secretary shall refer such complaint to such state or local agency. There is no evidence in this case of any such reference to a local or state agency, possibly due to the fact that the Secretary concluded there was no violation alleged in plaintiff's complaint. In any event, the Act provides that thirty days after a complaint is filed with the Secretary, or within thirty days after expiration of any period of reference to a state or local agency, if voluntary compliance has not been obtained, then the aggrieved person may, within thirty days, commence a civil action in any appropriate United States District Court. The Act further provides, in Section 3610(d), "that no such civil action may be brought in any United States District Court if the person aggrieved has a judicial remedy under a state or local fair housing law which provides rights and remedies for alleged discriminatory housing practices which are substantially equivalent to the rights and remedies provided in this subchapter." The State of Michigan has legislation dealing with discrimination in housing and fair housing practices. Specifically, Public Act 112 of the Public Acts of 1968, known as the "Fair Housing Act of 1968," would encompass within its provisions a complaint such as the one the plaintiff has in this litigation. It is equally clear that the Act applies to municipal corporations such as the defendant in this case. The Act, which is found in Michigan Compiled Laws Annotated, Section 564.101, et seq., provides in Section 564.401 that administrative enforcement is delegated to the Michigan Civil Rights Commission. In examining all of the provisions of Michigan's Fair Housing Statutes, the court reaches the conclusion that it does "provide rights and remedies for alleged discriminatory housing practices which are substantially equivalent to the rights and remedies provided in [Title VIII]."

Title VIII appears to provide an alternate course of action for aggrieved parties, and that is that they may institute civil actions in United States District Courts without regard to first filing administrative complaints. Section 3612 of the Act provides that an action may be commenced in an appropriate United States District Court within one hundred and eighty (180) days after the alleged discriminatory housing practice occurred. The alleged discriminatory housing practice in this case occurred on June 7, 1973. Litigation was not commenced until September 18, 1974, a period of time considerably in excess of the one hundred and eighty (180) day provision provided in the statute.

Plaintiff would attempt to avoid the impact of this section by stating that the wrong was a continuing one, and, thus, there is no obligation to meet the one hundred and eighty (180) day jurisdictional requirement. In support of this position, plaintiff again relies upon making an analogy between Title VIII and Title VII and cites the court to cases decided under Title VII. The first such case cited is *Bartmess v. Drewrys USA, Inc.*, 444 F.2d 1186 (7th Cir. 1971). *Bartmess* is a Title VII employment discrimination case involving a retirement system. Although the case does contain some general language supportive of plaintiff's contentions in this regard, the facts make it clearly inapposite. The issue in *Bartmess* was whether the plaintiff had filed her complaint too soon. Since the case dealt with retirement, the employer argued that the plaintiff should have no cause of action until she actually retired. The court found that because of the continuing employment relationship and the fact that

there was no question as to what would happen to the plaintiff upon retirement that there had been a timely filing under the Act.

Plaintiff also cites *Kohn v. Royall, Koegel and Wells*, 59 F.R.D. 515, 5 F.E.P. 725 (D.C. N.Y.1973). *Kohn* was a class action case alleging sex discrimination. The case stands for the proposition that where a named plaintiff representing a class is complaining about a continuing act of discrimination, the fact that the individual plaintiff late filed with the E.E.O.C. would not defeat the class action. Thus, the *Kohn* case is also inapposite.

The third case relied upon by plaintiff in this regard is *Tippett v. Liggett & Myers Tobacco Co.*, 316 F.Supp. 292 (N.D.N.C. 1970). Again this is a class action, and the same comments made relative to *Kohn, supra*, would be applicable. Additionally, *Tippett*, like the other cases relied upon by the plaintiff, involves a continuing discriminatory employment practice in connection with plaintiffs that have a continuing relationship with their employer. Here, in the case at bar, the contact between the plaintiff and the defendant was such that an exact date can be determined on which the alleged discriminatory practice occurred. If there was validity to the argument that because the defendant still maintained its

residency policy that there was a continuing discriminatory act, then the time limits of Title VII would become entirely meaningless. For example, in every case of employment discharge brought under Title VII, plaintiffs invariably plead a pattern and practice of discriminatory conduct. Since this pattern and practice arguably continues, the end result would be that a discharged employee would have forever to bring his complaint. Such was clearly not the intention of Congress in enacting the time limits that are contained in both Title VII and Title VIII. Similarly, as applied to the facts in this case, the argument advanced by the plaintiff would mean that there would be no time limit in which they would have had to institute action.

The court thus concludes that there has been a failure on the part of the plaintiff to comply with two of the jurisdictional time limits contained in Title VIII as well as a failure to resort to the state courts as is required if one elects to pursue the administrative complaint option afforded by the statute.

For the reasons stated hereinabove, the court concludes that the plaintiff has failed to meet her burden of proof under any of the jurisdictional sections upon which she has relied, and accordingly, a judgment of no cause of action in favor of the defendants is being entered in accordance with this Opinion.